[No. A054514. First Dist., Div. One. July 30, 1992.]

MICHAEL WILLIAM GROMIS, Plaintiff and Appellant, v.
MEDICAL BOARD OF CALIFORNIA, Defendant and Respondent.

## COUNSEL

W. Scott Quinlan and Roger T. Nuttall for Plaintiff and Appellant.

Daniel E. Lungren, Attorney General, and Joel S. Primes, Deputy Attorney General, for Defendant and Respondent.

## OPINION

DOSSEE, J.—In this administrative mandamus action, the question is whether the Medical Board of California (Medical Board) may discipline a physician who dated and engaged in consensual sexual activity with a patient.

### PROCEDURAL HISTORY

In June 1989, an accusation was filed by the Board of Medical Quality Assurance charging Michael William Gromis, M.D., with unprofessional conduct in that he engaged in sexual activity with a patient, in violation of section 726 of the Business and Professions Code.[1] The matter was heard by an administrative law judge (ALJ) from the Office of Administrative Hearings, who concluded that cause for discipline had been established and ordered Dr. Gromis's license to practice medicine revoked, with the revocation stayed, and Dr. Gromis placed on probation for five years and suspended from the practice of medicine for ninety days. The Division of Medical Quality of the (newly named) Medical Board declined to adopt the ALJ's proposed decision and heard additional arguments. In the end, however, the division adopted the ALJ's decision but reduced the period of suspension to 60 days.

Dr. Gromis then filed a petition for writ of mandate seeking to set aside the order of the Medical Board. The trial court reviewed the administrative

[1]Section 726 reads as follows: "The commission of any act of sexual abuse, misconduct, or relations with a patient, client, or customer which is substantially related to the qualifications, functions, or duties of the occupation for which a license was issued constitutes unprofessional conduct and grounds for disciplinary action for any person licensed under this division, under any initiative act referred to in this division and under Chapter 17 (commencing with Section 9000) of Division 3."

record and, exercising its independent judgment, denied the petition. Dr. Gromis (hereafter plaintiff) appeals.

## FACTS

In administrative mandamus proceedings, the trial court exercises its independent judgment on the evidence before it, while the appellate court merely reviews the record as a whole to determine whether the trial court's findings are supported by substantial evidence. (*Franz* v. *Board of Medical Quality Assurance* (1982) 31 Cal.3d 124, 135 [181 Cal.Rptr. 732, 642 P.2d 792]; *Rivard* v. *Board of Pension Commissioners* (1985) 164 Cal.App.3d 405, 412 [210 Cal.Rptr. 509].) On appeal, the record is viewed in the light most favorable to the respondent, indulging all reasonable inferences and resolving all conflicts in support of the judgment. (*Kearl* v. *Board of Medical Quality Assurance* (1986) 189 Cal.App.3d 1040, 1052 [236 Cal.Rptr. 526].) In light of these principles, we summarize the facts.

Dr. Gromis is a physician practicing family and internal medicine. Tina M. had been a patient of Dr. Gromis since 1986. She considered him her primary care physician and went to him for advice and treatment of various physical ailments (e.g., stomach problems, eye irritation, sinus problems, ear infection). During the events at issue, Ms. M. was 41. She had completed two years of college and worked as a law librarian.

In November 1987, Ms. M., during an office visit, told Dr. Gromis she was emotionally distressed from marital problems. On January 14, 1988, Ms. M. and Dr. Gromis mutually agreed to meet for lunch. He initiated the date, and she agreed. At lunch, Ms. M. again mentioned her marital difficulties, and Dr. Gromis told Ms. M. about his own marriage. Soon thereafter, the two met again for lunch. Ms. M. asked Dr. Gromis if she should see another doctor for her emotional problems, but he replied that doctors made too much of anxiety syndrome and that was not her problem.

A few days later, on January 21, Ms. M. agreed to meet Dr. Gromis at his home. She parked her car in his garage, and he came out to meet her. They walked into the house, and Dr. Gromis immediately whisked her off her feet and carried her into the bedroom, where they had sexual intercourse.

A week later, on January 28, the two arranged to meet at a hotel during the lunch hour. When Ms. M. arrived at the room, Dr. Gromis immediately tried to undress her, but Ms. M. protested that she had to leave. Dr. Gromis invited her to come back to the room after work, but Ms. M. declined. She had decided not to see him socially any more.

She still considered him her physician, however, and a few days later, on February 1, 1988, she visited his office for a sore throat. During the visit, Dr. Gromis mentioned he was going to Switzerland and said that if she had been single, he would have asked her to go with him. At the end of the examination, he lifted her from the table, kissed her on the cheek and put her on the floor.

A few weeks later, on February 20, after Dr. Gromis returned from his trip, Ms. M. agreed to meet him at a motel, where they had intercourse. Ms. M. asked Dr. Gromis if she should see another physician, but he replied that it wasn't necessary. Then he added that he could treat her for anything above the waist, and she should see another physician for anything below the waist. Later that day, Ms. M. met Dr. Gromis and his children at the Chinese Festival.

On February 23, 1988, Ms. M. visited Dr. Gromis in his office for a cyst on her lip. Dr. Gromis referred her to another doctor, who removed the cyst surgically. The next day, Ms. M. fell down some stairs at work and injured her hip and leg. On February 25, she went to Dr. Gromis for an examination; he referred her to a radiologist. About this time, Ms. M.'s husband became suspicious, so they stopped seeing each other although they continued to speak on the phone.

On March 18, 1988, Ms. M. decorated Dr. Gromis's office with a banner for his 40th birthday. Three days later, the two met for a walk in the park. At one point, Dr. Gromis pushed Ms. M. up against the restroom building and lifted her dress. Ms. M. resisted, and they walked back to the car.

A few days later, in a telephone conversation, Ms. M. ended the social relationship.[2] She testified that afterward she "felt worse than when I had started [the relationship], because . . . the anxiety was just more than I could control, and I was under a lot of stress." About a year later, she sought psychological counseling.

*Defense*

Dr. Gromis's medical assistants, who customarily enter the patient's symptoms and complaints onto the patient's chart in preparation for the doctor's examination, testified that Ms. M. did not complain of emotional problems. Dr. Gromis testified that Ms. M. did not mention emotional problems during her office visits. Nor did she ever ask for a referral to a psychiatrist or psychologist. If she had asked, he would have referred her.

---

[2]Apparently, in the interim, Ms. M.'s husband confronted Dr. Gromis about the affair. It was Ms. M.'s husband who complained to the Medical Board.

Dr. Gromis testified that when Ms. M. visited him at his house, he told her it would be best for her to find another primary care doctor. Although he would treat friends or family for minor problems, he did not want the responsibility of treating a close friend in a crisis.

Several defense medical witnesses testified that Dr. Gromis is a well qualified, competent physician. They also testified that it is appropriate for physicians to become friends with their patients, and they were unaware of any blanket prohibition against dating or sexual activity with a patient.

*Rebuttal*

Two expert witnesses testified that it is unethical and below the standard of medical care for a physician to engage in sexual relations with a patient.[3] In their view, the standard of care requires the physician to terminate the doctor-patient relationship before entering a social relationship. One of the experts based his opinion on his own interpretations of A.M.A. rules and section 726 of the Business and Professions Code. The other based his opinion on his experience and "vague impression of the law." He had not read section 726.

### DISCUSSION

The disciplinary proceedings were grounded on section 726 of the Business and Professions Code, which provides that "The commission of any act of sexual abuse, misconduct, or relations with a patient, client, or customer which is substantially related to the qualifications, functions, or duties of the occupation for which a license was issued constitutes unprofessional conduct and grounds for disciplinary action . . . ."

As plaintiff points out, the statute does not bar all sexual relations with a patient—only activity which is "substantially related to the qualifications, functions, or duties of the occupation."[4] ■ Indeed, constitutional considerations require that a statute "bar a person from practicing a lawful

---

[3]The Council on Ethical and Judicial Affairs of the American Medical Association (A.M.A.) has issued an opinion that "[s]exual misconduct in the practice of medicine violates the trust the patient reposes in the physician and is unethical."

We note that the A.M.A. opinion does not define "misconduct." But we need not decide whether Dr. Gromis violated the A.M.A. guidelines, as the disciplinary proceeding here was based solely on section 726 of the Business and Professions Code.

[4]The "substantial relationship" requirement is defined by regulation: "For the purposes of denial, suspension or revocation of a license, certificate or permit pursuant to Division 1.5 (commencing with Section 475) of the code, a crime or act shall be considered to be substantially related to the qualifications, functions or duties of a person holding a license, certificate or permit under the Medical Practice Act if to a substantial degree it evidences

profession only for reasons related to his fitness or competence to practice that profession." (*Newland* v. *Board of Governors* (1977) 19 Cal.3d 705, 711 [139 Cal.Rptr. 620, 566 P.2d 254]; accord, *Arneson* v. *Fox* (1980) 28 Cal.3d 440, 448 [170 Cal.Rptr. 778, 621 P.2d 817].) ▮▮▮ "Accordingly, standards for excluding persons from engaging in such commercial activities must bear some reasonable relation to their qualifications to engage in those activities." (*Id.*, at p. 448; see also *Morrison* v. *State Board of Education* (1969) 1 Cal.3d 214, 234-235 [82 Cal.Rptr. 175, 461 P.2d 375].)[5]

An annotation in American Law Reports has compiled the cases involving disciplinary proceedings against physicians and dentists on account of sexual activity with a patient. (Annot. (1988) 59 A.L.R.4th 1104.) Of course, nonconsensual sexual advances or touching has been upheld as a ground for discipline. (*Id.*, at pp. 1124-1130.) Consensual sexual activity, too, has been found a legitimate basis for discipline when the sexual activity occurred under guise of treatment, as part of a physical examination, during psychiatric treatment or in exchange for drugs.

In California, the case law is sparse. The cases have primarily involved psychotherapists who engaged in sexual activity with a patient during treatment.[6] (*Waters* v. *Bourhis* (1985) 40 Cal.3d 424, 433, and fn. 8 [220 Cal.Rptr. 666, 709 P.2d 469] [malpractice action]; *Richard H.* v. *Larry D.* (1988) 198 Cal.App.3d 591, 595-596 [243 Cal.Rptr. 807] [same]; *Dresser* v. *Board of Medical Quality Assurance* (1982) 130 Cal.App.3d 506 [181 Cal.Rptr. 797] [disciplinary proceedings]; *Cooper* v. *Board of Medical Examiners* (1975) 49

present or potential unfitness of a person holding a license, certificate or permit to perform the functions authorized by the license, certificate or permit in a manner consistent with the public health, safety or welfare. Such crimes or acts shall include but not be limited to the following: Violating or attempting to violate, directly or indirectly, or assisting in or abetting the violation of, or conspiring to violate any provision of the Medical Practice Act." (Cal. Code Regs., tit. 16, § 1360.)

[5]Plaintiff argues that section 726 is vague and thereby violates due process in that it fails to give notice of prohibited conduct. Such arguments have previously been rejected on the ground that by limiting discipline to acts which are substantially related to the qualifications to practice the profession, the statute has the required specificity and therefore passes constitutional muster. (*Morrison* v. *State Board of Education, supra*, 1 Cal.3d at pp. 220-233 [immoral or unprofessional conduct and acts involving moral turpitude]; see also *Board of Education* v. *Swan* (1953) 41 Cal.2d 546, 553-554 [261 P.2d 261], overruled on other grounds in *Bekiaris* v. *Board of Education* (1972) 6 Cal.3d 575, 588, fn. 7 [100 Cal.Rptr. 16, 493 P.2d 480] [unprofessional conduct].) In light of their professional expertise, doctors are expected to recognize conduct that constitutes unfitness to practice medicine. (*Shea* v. *Board of Medical Examiners* (1978) 81 Cal.App.3d 564, 574-575 [146 Cal.Rptr. 653] [unprofessional conduct]; see also *Morrison* v. *State Board of Education, supra*, 1 Cal.3d at p. 233 [unfitness to teach].)

[6]See also *Shea* v. *Board of Medical Examiners, supra*, 81 Cal.App.3d 564 (sexually explicit language during hypnosis by osteopath treating patients for hip and back pain held unprofessional conduct); *Board of Trustees* v. *Stubblefield* (1971) 16 Cal.App.3d 820, 825-827 [94 Cal.Rptr. 318] (teacher who engaged in sexual activity with student held unfit to teach).

Cal.App.3d 931 [123 Cal.Rptr. 563]; *Bernstein* v. *Board of Medical Examiners* (1962) 204 Cal.App.2d 378 [22 Cal.Rptr. 419].) As one court has noted: "The fact that the authorities cited to us and those which we have independently considered, all relate to mental health professionals reflects the greater propensity of psychiatric patients to develop strong emotional dependence upon their physicians in what is called the transference phenomenon and, correspondingly, the greater possibility for emotional exploitation of the patient. (See *Zipkin* v. *Freeman, supra,* 436 S.W.2d at p. 755, fn. 1 [436 S.W.2d. 753].)" (*Atienza* v. *Taub* (1987) 194 Cal.App.3d 388, 393, fn. 2 [239 Cal.Rptr. 454].) Indeed, psychotherapists are treated differently from other health professionals. (Civ. Code, § 43.93 [cause of action for sexual contact]; Bus. & Prof. Code, § 729 [criminal liability for sexual relations with patients].)

In the only case presenting facts analogous to the present one—a physician engaged in an adult consensual sexual relationship with a patient—the court reversed the order imposing discipline. (*Yero* v. *Department Professional Reg.* (Fla.Dist.Ct.App. 1985) 481 So.2d 61.) In that case, however, the physician had terminated the doctor-patient relationship before entering into the sexual relationship with the patient.[7] The Florida statute prohibited "sexual misconduct" in the practice of medicine, and "misconduct" was defined as the use of the physician-patient relationship to induce a patient to engage in sexual activity. The court reasoned that although termination of the doctor-patient relationship would not insulate the physician from discipline for sexual misconduct, there was no evidence that the physician had used the doctor-patient relationship to induce the patient's consent to sexual activity. (Cf. *Haley* v. *Medical Disciplinary Bd.* (1991) 117 Wash.2d 720 [818 P.2d 1062] [discipline justified by evidence physician exploited his status as physician to initiate sexual relationship with minor].)

The only California case to interpret Business and Professions Code section 726 is *Atienza* v. *Taub, supra,* 194 Cal.App.3d 388, which was not a disciplinary proceeding but a malpractice action. The plaintiff-patient alleged that by initiating a sexual relationship with her while she was under his care, the defendant-doctor failed to meet the standard of care and violated Business and Professions Code section 726. The appellate court rejected the argument, holding that a sexual relationship with a patient constitutes professional negligence "only if the physician engaged in the sexual conduct on the pretext that it was a necessary part of the treatment for which the patient has sought out the physician." The court reasoned that a physician's duty of

---

[7]In the present case, in contrast, the trial court found, and the evidence supports the finding, that Dr. Gromis did not terminate the doctor-patient relationship with Ms. M. before the two entered their sexual relationship.

care extends only to the scope of services he or she is rendering for the patient, and a sexual relationship with the patient is not within that scope unless the sexual activity occurs under the guise of rendering professional services. Hence, the court concluded the plaintiff in the case before it had no cause of action: "Appellant does not allege that she was induced to have sexual relations with respondent in furtherance of her treatment. Essentially, appellant complains that she had an unhappy affair with a man who happened to be her doctor. This is plainly insufficient to make out a cause of action for professional negligence under any of the theories presented." (194 Cal.App.3d at pp. 393-394, fns. omitted.)

In a footnote, the court interpreted Business and Professions Code section 726 as follows: "Appellant has three theories in connection with the cause of action for professional negligence: breach of fiduciary duty created by the physician-patient relationship; violation of section 726 of the Business and Professions Code; and a violation of the Hippocratic oath. The first two theories necessarily assume that the sexual relationship, which allegedly breached both the fiduciary duty and section 726, occurred within the context of the physician-patient relationship. Since it was not alleged that it was a modality of treatment, there was neither a breach nor a violation. Indeed, section 726, which is a licensing provision, allows the licensing authority to discipline a physician who engages in sexual acts with a patient only if it is 'substantially related to the qualifications, functions, or duties of the occupation for which a license was issued . . . .' (Bus. & Prof. Code, § 726.)" (194 Cal.App.3d at p. 394, fn. 3.)

Plaintiff relies on this language from *Atienza* to argue that because he made no misrepresentation that the sexual acts were necessary as part of the treatment, his relationship with Ms. M., as a matter of law, had no bearing on his qualifications, duties or functions as a physician. We consider the language from *Atienza* regarding Business and Professions Code section 726 to be mere dictum, and we decline to apply it to a disciplinary proceeding. To take the approach urged by plaintiff presupposes that the only reason for proscribing physician-patient sexual activity is the potential for deception by the doctor. Hence, plaintiff reasons that when the patient has not been deceived there is no basis for discipline. Yet, plaintiff has overlooked other reasons for proscribing sexual activity: for example, the doctor may use his or her status to induce the patient's consent to sexual activity, or the doctor's medical judgment may be compromised by his or her sexual interest in the patient. ▮ Because situations can be contemplated where the physician's professional duties will affect or be affected by a sexual relationship with the patient, we decline to hold as a matter of law that only sexual conduct under guise of treatment can serve as grounds for discipline. Rather,

the question must be decided on a case-by-case basis: whether under the circumstances the sexual conduct bears some relationship to the physician's qualifications, functions or duties.

Plaintiff next argues that even under the facts as found by the trial court, there is no basis for the trial court's conclusions that the relationship with Ms. M. substantially affected plaintiff's fitness, functions or duties as a physician. We think this argument has merit. We emphasize that we do not condone plaintiff's conduct. However, the question before us is not whether plaintiff's conduct was morally reprehensible but whether his conduct was substantially related to his qualifications or fitness to practice medicine. That question is one of law for this court's independent determination. (*Windham* v. *Board of Medical Quality Assurance* (1980) 104 Cal.App.3d 461, 469-471 [163 Cal.Rptr. 566]; see also *Bekiaris* v. *Board of Education, supra,* 6 Cal.3d 575, 589-590; *Clerici* v. *Department of Motor Vehicles* (1990) 224 Cal.App.3d 1016, 1027 [274 Cal.Rptr. 230].)

The trial court concluded that Dr. Gromis's sexual relationship with Ms. M. related to the functions and the duties of a physician in two respects: first, "the whole intimate relationship arose out of the physician-patient relationship," and, second, "[it] caused injury to the patient." The trial court restated these findings as follows: "[Dr. Gromis] took advantage of a position of trust and inserted the intimate social relationship over the existing professional relationship. This caused injury to patient Tina M. because of the added stress, anxiety and worsened marital problems."

These findings are insufficient to support the legal conclusion that the sexual relationship had a bearing on the functions and duties of a physician. Although Ms. M. suffered additional stress and anxiety and her marital problems worsened as a result of her extramarital affair with Dr. Gromis, there is no finding or evidence that it was plaintiff's status as her doctor that led to this injury. As in *Atienza*, Ms. M. suffered harm because "she had an unhappy affair with a man who happened to be her doctor."

It is true that the relationship between plaintiff and Ms. M. arose out of the physician-patient relationship in that it was through this professional contact that the two met. But the trial court made no finding that plaintiff abused his status as Ms. M.'s doctor to induce her consent to sexual activity. (Cf. *Haley* v. *Medical Disciplinary Bd., supra,* 818 P.2d 1062; *Yero* v. *Department Professional Reg., supra,* 481 So.2d 61.) The record is susceptible to contrary inferences on this point. On the one hand, it might be found that Dr. Gromis took advantage of information gained through his status as Ms. M.'s physician, namely, her marital problems, and initiated an extramarital affair. On

the other hand, it might be found that the sexual relations arose from the mutual friendship and affection that formed outside the office. We remand for an additional finding on this issue.

The trial court also ruled that "A doctor's sexual misbehavior with a patient adversely affects his fitness to practice medicine." This ruling, however, begs the question, for it does not decide whether the sexual relationship here was "misbehavior," i.e., whether it substantially related to the doctor's fitness so as to violate Business and Professions Code section 726. The trial court noted that "Drs. Schommer and Ostrich presented their opinions that sexual relations with a patient are below the California medical standard of care . . . ." Yet, the testimony of Drs. Schommer and Ostrich was based solely on their opinions that *all* sexual relations between doctor and patient are prohibited. Insofar as the trial court's ruling was a finding that by engaging in sexual relations with a patient plaintiff ipso facto was unfit to practice, the ruling was incorrect. Both the statute (Bus. & Prof. Code, § 726) and constitutional considerations compel a more limited rule: a sexual relationship between physician and patient is not a sufficient basis for discipline without a finding that the sexual relationship was "substantially related to the qualifications, functions, or duties" of a physician.

By all accounts, plaintiff's treatment of Ms. M.'s physical ailments was appropriate and competent. The only area in which plaintiff's professional conduct may have been affected by the sexual relationship was his decision to ignore Ms. M.'s pleas for psychological counseling. Yet, the record is also susceptible to the inference that Dr. Gromis ignored Ms. M.'s requests for emotional counseling because he did not consider "anxiety" a symptom worthy of attention. The trial court made no finding that because of plaintiff's sexual interest in Ms. M. plaintiff's objective medical judgment was compromised, that plaintiff dissuaded Ms. M. from seeking marital counseling because it was in his personal interest that her marital problems go unsolved.[8] The trial court did find (adopting the ALJ's finding verbatim) that plaintiff ignored Ms. M.'s request for a referral to a counselor for her marital and emotional problems.[9] But there is no finding that it was the sexual relationship that led to the omission.

---

[8] In his objections to the statement of decision and request for additional findings, plaintiff asserted that "There is no evidence that [plaintiff's] treatment of the patient for her *physical* ailments was, in fact, adversely affected by the sexual relationship. There was no expert testimony that, under the facts of the case, any failure to refer for counseling was below the standard of care . . . ." (Italics in original.)

[9] That finding is followed in the next paragraph of the statement of decision by the finding (also verbatim from the ALJ's findings) that "[plaintiff's] actions with Tina M. were below the required medical standard of care in California." Because plaintiff was not charged with negligence in the treatment of Ms. M., we cannot construe that latter finding as a finding that

We recognize that conduct may be substantially related to a physician's fitness though the conduct does not relate to the skills needed for the practice of medicine. (*Windham* v. *Board of Medical Quality Assurance, supra,* 104 Cal.App.3d 461 [conviction for tax evasion substantially related to physician's fitness].) Nevertheless, we conclude that the findings made here are insufficient to support the order of discipline. We remand for further findings on whether plaintiff took advantage of his status as Ms. M.'s physician to induce Ms. M. into the relationship and whether plaintiff's failure to refer Ms. M. for counseling was related to his sexual relationship with her.

The judgment is reversed. The parties shall bear their own costs on appeal.

Stein, J., concurred.

**NEWSOM, Acting P. J.,** Dissenting.—In my opinion Business and Professions Code section 726, being entirely unintelligible, is a fortiori void as being unconstitutionally vague, i.e., *no* reasonable and practical construction can be given its language, and in any event it gives no fair warning of the conduct one might conjecture that it seeks to prohibit.

Thus, as here invoked, the section purports to proscribe sexual relations between a doctor and a patient "which [are] substantially related to the qualifications, functions, or duties of the occupation for which a license was issued . . . ."

As I am of the opinion that sexual relations cannot, under any conceivable circumstances, *relate,* substantially or otherwise, to any qualification, or function, or duty, of any *occupation* (licensed or unlicensed), I am forced to my conclusion that, being meaningless, the statute is unconstitutional both on its face and as applied to the present case.

I am opposed to remand for other reasons as well. So far as I can discern, the record contains no evidence which could support the finding we invite the trial court to make concerning Dr. Gromis's abuse of his professional relationship with his former patient.

My reading of the record compels me to conclude that—legally, at any rate—Dr. Gromis is blameless, that the sexual conduct of the parties was the result of mutual attraction and affection, however misplaced, and that the

---

in failing to refer Ms. M. to a counselor, plaintiff's conduct fell below the standard of care. In any event, a single instance of negligent treatment, without more, is not grounds for discipline. (Bus. & Prof. Code, § 2234 [gross negligence or repeated negligent acts constitute unprofessional conduct]; see *James* v. *Board of Dental Examiners* (1985) 172 Cal.App.3d 1096, 1109 [218 Cal.Rptr. 710].)

entire sorry proceeding below is a kind of travesty in which the state has acted principally as the conduit for venting the recriminations of a troubled person. Consequently, for the reasons set forth in *Atienza* v. *Taub* (1987) 194 Cal.App.3d 388 [239 Cal.Rptr. 454], I would reverse.

A petition for a rehearing was denied August 27, 1992, and appellant's petition for review by the Supreme Court was denied October 16, 1992.