[No. B090591. Second Dist., Div. Three. June 18, 1996.]

ELLIOT SAUL GREEN, Plaintiff and Appellant, v.
BOARD OF DENTAL EXAMINERS, Defendant and Appellant.

**COUNSEL**

Freeburg, Judy & Nettels and Steven J. Freeburg for Plaintiff and Appellant.

Daniel E. Lungren, Attorney General, and William L. Marcus, Deputy Attorney General, for Defendant and Appellant.

**OPINION**

**KITCHING, J.**—In this appeal, we are asked to consider whether the Board of Dental Examiners (Board) can discipline a dentist for engaging in allegedly consensual sexual relations with his female patients. Under the circumstances of this case, we find that it can.

The Board took disciplinary action against Dr. Elliot Saul Green (Green) as a result of patient complaints of sexual misconduct. Green filed a petition for writ of mandate to set aside the Board's order. The trial court denied Green's petition, but remanded the issue of laches to the Board for an evidentiary hearing and determination. The Board appeals from the portion of the judgment remanding the laches issue. Green cross-appeals from the portion of the judgment sustaining the Board's disciplinary action.

On the appeal, we find Green failed either to argue a laches defense or present evidence of prejudice at the administrative hearing. Accordingly, we

reverse the ruling requiring a remand to the Board, and order the trial court to enter a new and different judgment denying the writ petition in its entirety.

On the cross-appeal, we find the trial court's decision to sustain the Board's disciplinary action was supported by substantial evidence. Accordingly, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The administrative charges against Green arose from improper sexual conduct with two female patients through his misuse of craniosacral therapy to treat their temporomandibular joint (TMJ) conditions.[1] Green asserts the craniosacral therapy is an osteopathic procedure used to correct a TMJ problem. He alleges the treatment involves subtle physical manipulation of the head, neck, shoulders, sternum, spine, sacrum and pelvic areas to eliminate misalignment problems affecting the jaw. We express no opinion as to the validity of this procedure.

In November 1987, P.M., a former patient, complained to the Board about incidents of Green's improper sexual conduct that occurred in 1986 and 1987. In September 1990, the Board filed an accusation charging the dentist with unprofessional conduct in that he performed craniosacral therapy for his own sexual gratification and he engaged in sexual activity with a patient, in violation of Business and Professions Code section 726.[2] On or about October 29, 1992, Green moved to dismiss the accusation and asserted laches as an equitable defense. The motion was denied on December 7, 1992, without prejudice to its renewal at the administrative hearing.

In April 1991, P.B., another of Green's former patients, also complained to the Board about incidents of Green's improper sexual conduct that occurred in 1985 and 1986. In April 1993, the Board filed an amended and supplemental accusation asserting charges against the dentist similar to those contained in the first accusation.

On November 17, 1994, following a disciplinary hearing, the Board determined cause for discipline existed and revoked Green's license, with

[1]Three of Green's former patients, two who are involved in this appeal, unsuccessfully sued the dentist in 1991 for damages based on claims of sexual impropriety. However, we find the outcome of that civil action for financial liability irrelevant to our current review of an administrative disciplinary proceeding involving the revocation of a license based on the need to protect the public. Green has failed to either provide us competent evidence about the civil trial or the verdict, or legally explain how the outcome of that litigation affects our ruling on this appeal.

[2]Unless otherwise indicated, all further statutory references are to the Business and Professions Code.

revocation stayed, and Green placed on probation for seven years. The Board based its determination on grounds his actions constituted sexual misconduct (§ 726) and unprofessional conduct (§ 1680). At the hearing, Green neither presented a laches argument nor renewed his motion to dismiss.

In its decision, the Board rejected Green's claim that he could not be disciplined for his sexual relations with P.M. because they "were entirely outside his professional association with her." The Board found "[t]he seduction and bedding of [P.M.] was intimately connected with respondent's position and conduct as [P.M.'s] treating dentist." The Board found that Green "used his professional position to persuade at least two of his patients to undergo cranio-sacral therapy and then exceeded the scope of the patient's consent to seduce them . . . ." The Board further found the manipulations used by Green during the "therapy" were subtle and suggestive and seduced the patients "into agreeing to have sex with him." Green, the Board determined, "abused his professional position, violated his patients' trust, and exceeded the scope of the patients' consent for treatment." The Board determined cause existed to impose discipline under section 726 for sexual misconduct, and under section 1680 for professional misconduct, but not under section 1670 for gross negligence or repeated acts of negligence. The Board did not issue a specific ruling as to the laches issue.

On November 11, 1994, Green sought mandamus relief in the superior court to compel the Board to reinstate his license. Green contended (1) the action of the Board was precluded by laches, (2) the revocation decision was not supported by the evidence, (3) the complaining witnesses lacked credibility, and (4) as a matter of law, the sexual conduct was not actionable because it was not represented as a part of therapy. In opposition, the Board argued Green failed to make a showing of prejudicial delay to support a laches defense and there was substantial evidence to support the facts essential for the Board's findings. On December 21, 1994, after an independent evaluation of all the evidence, the trial court denied Green's petition, but remanded the issue of laches to the Board for an evidentiary hearing and determination.[3]

On January 24, 1995, the Board filed a notice of partial appeal. On February 7, 1995, Green filed a notice of partial cross-appeal.

---

[3]The order read, in pertinent part: "The matter is remanded to respondent for further findings, and evidence if necessary, on whether laches has prejudiced petitioners. Respondent shall have the burden of proving excusable delay and that petitioner was not prejudiced thereby. The periods between the complaints being filed and the filing of the accusation and between the filing of the accusation and decision shall be addressed. [¶] The court observes that all other grounds asserted in support of the petition are not well founded. But for the laches issue the petition would be denied."

## CONTENTIONS

On appeal, the Board contends the trial court erred in remanding the laches issue to the Board and in shifting the burden to the administrative agency to explain delay and disprove prejudice.

On cross-appeal, Green contends the trial court erred in affirming the Board's disciplinary action on grounds (1) sexual conduct with patients is actionable under section 726 only when it occurs under the guise of treatment, and (2) the complaining witnesses lacked credibility.

## DISCUSSION

*Green Failed to Present a Laches Defense or Prove Prejudicial Delay at the Administrative Hearing.*

The Board contends the trial court erred in remanding the laches issue and in shifting the burden to the agency to show delay and disprove prejudice. We agree.

*Standard of Review*

We address the issue of laches in light of two principles of law: First, "[i]n administrative mandamus actions brought under section 1094.5 of the Code of Civil Procedure, appellate review is limited to issues in the record at the administrative level. 'It is fundamental that the review of administrative proceedings . . . is confined to the *issues* appearing in the record of that body as made out by the parties to the proceedings, though additional *evidence*, in a proper case, may be received. [Citation.] It was never contemplated that a party to an administrative hearing should withhold any defense then available to him or make only a perfunctory or "skeleton" showing in the hearing and thereafter obtain an unlimited trial de novo, on expanded issues, in the reviewing court. [Citation.]' " (*City of Walnut Creek* v. *County of Contra Costa* (1980) 101 Cal.App.3d 1012, 1019-1020 [162 Cal.Rptr. 224].)

Second, "[a]s [determined by our Supreme Court] in *Conti* v. *Board of Civil Service Commissioners* (1969) 1 Cal.3d 351. . . , the affirmative defense of laches requires unreasonable delay in bringing suit 'plus either acquiescence in the act about which plaintiff complains or prejudice to the defendant resulting from the delay.' [Citation.] Prejudice is never presumed; rather it must be affirmatively demonstrated by the defendant in order to sustain his burdens of proof and the production of evidence on the issue.

[Citation.]" (*Miller* v. *Eisenhower Medical Center* (1980) 27 Cal.3d 614, 624 [166 Cal.Rptr. 826, 614 P.2d 258].)

*Green Failed to Present Evidence of Prejudice.*

 The record reflects that in December 1992, Green's motion to dismiss the accusation was denied without prejudice to its renewal at the administrative hearing. The motion only addressed the accusation covering P.M.'s complaints. Prior to the commencement of the administrative hearing in October 1994, the administrative law judge (ALJ) inquired whether the parties wanted to present any preliminary matters to the court. Green responded, "Nothing preliminarily." When the ALJ stated, "All right. I assume that the laches defense still applies?" Green then answered, "Yes, your honor." The record further reflects that during the four-day hearing, Green failed to renew his motion to dismiss or request to have the motion and the attached exhibits moved into evidence. He further failed to present *any* evidence of alleged delays incurred from the initial complaints to the time of hearing and resulting actual prejudice, or *any* supporting argument to the trier of fact. The ALJ only heard testimony on and received evidence of the sexual misconduct charges against the dentist.

It could be argued that by the ALJ's inquiry, the general issue of laches was raised at the hearing. However, raising the issue, in whatever form, did not relieve Green of his burden to produce evidence of both delay and prejudice resulting from the delay. (*Mt. San Antonio Community College Dist.* v. *Public Employment Relations Bd.* (1989) 210 Cal.App.3d 178, 188 [258 Cal.Rptr. 302]; *City of Walnut Creek* v. *County of Contra Costa, supra,* 101 Cal.App.3d at p. 1020.) "The party asserting and seeking to benefit from the laches bar bears the burden of proof on these factors." (*Mt. San Antonio Community College Dist.* v. *Public Employment Relations Bd., supra,* 210 Cal.App.3d at p. 188.)

 Green contends that testimony was received in the course of the hearing regarding witness memories and missing evidence. His argument is untenable for two reasons. First, his assertion represents an inaccurate portrayal of the proceedings and lacks any citations to the record, which this court carefully read in its entirety. Second, Green impermissibly attempts to shift his evidentiary burden to the trier of fact to consider, on its own, what evidence it thinks would support a dual finding of unreasonable delay and resulting prejudice. Delay and prejudice must be affirmatively shown; they will not be presumed from the evidence. (*Conti* v. *Board of Civil Service Commissioners* (1969) 1 Cal.3d 351, 362 [82 Cal.Rptr. 337, 461 P.2d 617]; *Miller* v. *Eisenhower Medical Center, supra,* 27 Cal.3d at p. 624.)

Even were we to assume arguendo that the defense of laches was properly presented and argued at the administrative hearing, Green failed to produce evidence that he was prejudiced by delays affecting this proceeding. "Delay alone ordinarily does not constitute laches . . . . What makes the delay unreasonable in the case of laches is that it results in prejudice. [Citation.]" (*Lam* v. *Bureau of Security & Investigative Services* (1995) 34 Cal.App.4th 29, 36 [40 Cal.Rptr.2d 137].) Green never argued at the administrative hearing he was prejudiced by the Board's delays. He now asserts on appeal that the passage of time resulted in missing evidence and witness recollection problems, and suggests this compromised his ability to locate additional witnesses and impeach the complaining witnesses. The record fails to support his position.

At the time of the administrative hearing, Green had available the depositions of the complaining witnesses, to wit, P.M. and P.B., taken two years prior in the civil action. He used statements from these transcripts frequently throughout the hearing to impeach the testimony of both women. P.M. and P.B. provided detailed testimony on both direct and cross-examination of the craniosacral therapy sessions and their sexual encounters with Green. Green used P.M.'s handwritten notes describing her attitudes and feelings towards him. While testimony as to some aspects of the sexual encounters may have been vague at times, it was, combined with prior deposition testimony, sufficient. Green has failed to show how this testimony affected his position. Furthermore, Green had available the transcript from his own deposition. He does not complain of his own inability to recall dates and events. The record reveals he testified in detail to the therapy sessions and his relationships with P.M. and P.B. The record also reveals that the passage of time did not affect the memory of Green's expert witness who testified on his behalf, and also testified for the dentist in the civil trial.

The only piece of missing and unavailable evidence was Green's 1985 appointment book. Green contends the calendar book would have assisted him in locating witnesses and proving, because of times and appointments, that sexual liaisons with P.B. did not occur. However, the absence of the book did not affect the outcome of this case. There is no evidence Green was unable to locate witnesses for the administrative hearing. The issue in this matter concerned not only outside the office sexual encounters with his patients, but how Green conducted himself during the craniosacral therapy sessions. Green was able to use dental records, billing records, and his memory to reconstruct his calendar and adequately testify to dates and times of the 1985 appointments. He was able to establish the dates and times of P.B.'s therapy sessions. He did not deny those appointments ever occurred.

Furthermore, Green never argued any witnesses were unable to testify at the administrative hearing because of the amount of time that passed.

Green failed to make a colorable showing of prejudice to support a finding of laches. We consider the issues presented at the administrative hearing and conclude that implicit in the Board's disciplinary order was a rejection of Green's laches defense. Green had an opportunity at the administrative hearing to present evidence on this affirmative defense. He did not meet his evidentiary burden. The trial court erred in remanding the matter for further consideration. We reverse the order.

*The Trial Court Incorrectly Shifted the Burden on Remand.*

Our decision to reverse the trial court's remand order effectively moots the issue of whether the Board, on remand, had the burden to disprove laches. The trial court relied on *Brown v. State Personnel Bd.* (1985) 166 Cal.App.3d 1151 [213 Cal.Rptr. 53] to shift the burden to the Board to explain any delays and disprove prejudice. However, in *Fahmy v. Medical Bd. of California* (1995) 38 Cal.App.4th 810, 817 [45 Cal.Rptr.2d 486], Division Two of our district determined "the *Brown* case [is] inapposite in the context of a license revocation proceeding." (See also *Lam v. Bureau of Security & Investigative Services, supra,* 34 Cal.App.4th at pp. 36-40.) The burden, therefore, remains with the party asserting laches as a defense. We find *Fahmy* well reasoned, applicable in our case, and determinative as to the proper allocation of burdens of proof in this laches defense. We also acknowledge that *Fahmy* had not been published at the time the trial court made its ruling.

*The Trial Court's Decision to Sustain the Board's Disciplinary Action Was Supported by Substantial Evidence.*

Green contends he entered into adult consensual sexual relationships with his former patients and, as a matter of law, is not subject to discipline by the Board. Under the circumstances of this case, we disagree.

*Standard of Review*

" 'The right to practice one's profession is a fundamental vested right and if a person's license to practice that profession is revoked by an administrative agency, when a petition for a writ of mandate is brought for restoration of the license, the trial court must apply its independent judgment to its review of the facts underlying the administrative decision. [Citations.]
" '

" 'Under the independent judgment rule, the trial court must weigh the evidence and make its own determination as to whether the administrative findings should be sustained. When an appeal is taken from the trial court's determination, it is given the same effect as any other judgment after trial rendered by the court: the only question is whether the *trial court's* (not the administrative agency's) findings are supported by substantial evidence. [Citation.] Conflicts in the evidence must be resolved in favor of the judgment and where two or more inferences can be reasonably drawn from the facts, the reviewing court must accept the inferences deduced by the trial court.' [Citation.] However, '. . . the trial court's legal conclusions are open to our examination to determine if errors of law were committed.' [Citation.]

" 'Evidence is substantial if any reasonable trier of fact could have considered it reasonable, credible and of solid value.' [Citation.] Additionally, a reviewing court 'may look to the findings in [the administrative agency's] decision for guidance in determining whether the trial court's judgment is supported by substantial evidence.' [Citation.]" (*Lam* v. *Bureau of Security & Investigative Services*, *supra*, 34 Cal.App.4th at pp. 35-36.)

Considering these principles, we review the facts presented at the hearing.

*Administrative Hearing*

 Green, 49 years old at the time of the administrative hearing, has been a licensed dentist since 1972, and a sole practitioner at his Hollywood Boulevard office since 1974. Two former patients, P.M. and P.B., testified against him at the hearing.[4]

*P.M.*

P.M. testified she was referred to Green in March 1986 for removal of amalgam fillings after her physician found high mercury levels in her blood.

---

[4]In addition to P.M., P.B., and Green, Dr. Gregory Cole (Cole) testified that based on certain assumptions, it was his opinion Green was guilty of extreme departures from community standards, sexual misconduct related to the practice of dentistry, and unprofessional conduct. Cole further testified that Green had created an environment through words, treatments, and movements, that led to sexual activity outside the office.

On behalf of Green, Dr. Thomas Chess (Chess) testified there were no ethical or legal constraints on a dentist having sexual relations with a patient. Green's activities did not amount to sexual misconduct, Chess stated, if he did not claim it was an essential part of the treatment.

E'Clair Candy Lee (Lee), Green's former dental assistant, testified as to her general office duties, but failed to provide specific information regarding P.M.'s or P.B.'s therapy sessions or testimony establishing her presence during these treatments.

Green advised P.M. she had TMJ and problems with her bite and recommended craniosacral therapy. He told her the treatments were necessary and would relieve her headaches and the pain in the temporomandibular joint. The treatments began in August 1986 and occurred once a week through January 1987, with three treatments in March 1987. They began after Green completed the removal and replacement of her fillings.

P.M. further testified the therapy treatments took place in a far room across the hall from Green's private office and lasted approximately 30 minutes. The lights in the room were dimmed, the shades were drawn, and "New Age" music played in the background. An attendant was not present during the sessions. P.M. was fully clothed during the treatments. She was positioned on her back in a curved dental chair.

P.M. further testified that during the treatment Green would place his hands on her head and, with his fingers, make subtle movements on her face, back of the neck and shoulders. Green would periodically place his hand on her sternum, between her breasts, and continue the hand movements. As the sessions continued, Green would brush her nipples and breasts with his hands. P.M. further testified that during the treatment Green placed one hand between her legs and under her sacrum, and the other hand on her belly, with his thumb on her pubic bone. Green then moved the palm and fingers of his hands in slow, rotating movements. This portion of the treatment lasted five to ten minutes.

P.M. further testified she felt uncomfortable after the first treatment and asked Green to treat her without these manipulations. Green, P.M. testified, laughed and said the treatments were anatomically necessary to free up tissue adhesions along the body. Green also told her this particular type of healing was necessary because of her history of childhood sexual abuse. P.M. agreed to further treatment because she trusted Green. She trusted Green because he was so patient with her during the removal of her amalgam fillings. During the second treatment, P.M. testified, Green placed his hands as he had in the first session, but it was more comfortable and she began to relax and trust him. The session relieved her headache.

P.M. further testified that after three or four therapy sessions she invited Green to lunch at the City Cafe and told him about the childhood molestations by her father, that she was in therapy, and then requested he separate out any sexual innuendoes from the treatment. He took her hand and said she could trust him, saying "sexual trauma, sexual healing." Green also talked of getting together in the future. P.M. also told Green about her father's death in January 1986 and how it was affecting her.

P.M. continued the therapy treatments. In one session, she testified, she lost consciousness and fell out of the chair. She awoke to discover Green holding her, kissing her face, and saying he loved her and that only he could heal her. A few months later, she again lost consciousness in a session and awoke to find Green, with an erection, moving his pelvis against her face. P.M. further testified Green often hugged her in the course of the treatments. She told Green the hugs made her uncomfortable as they were making the therapy sessions too personal and she had trouble separating the personal from the professional. Green laughed and said, "Don't worry."

P.M. further testified she met with Green on two occasions at Veterans Park to discuss what was going on and ask him to separate out the sexual component of the therapy. Green encouraged her not to be frightened, to allow "those kinds of things" to happen, that it was part of the healing and necessary for treatment of her TMJ problem. Green told her she needed to continue to trust him. Green also suggested she meet him later in Pomona as they could be alone.

Her sessions continued, P.M. testified. In November 1986, P.M. asked to be referred to another dentist. Green said no. Most of the sessions in December 1986 and January 1987 were emotional and P.M. cried. Green told her crying was good. In December 1986, Green called P.M. and asked her to the office on a day it was closed. P.M., instead, asked him to come to her house. When Green arrived, he came up behind P.M., took off his shirt, removed her clothes and kissed her body. P.M. testified she was frozen in fear and told him to stop, which he did, and then left.

P.M. further testified that in January 1987, at Green's suggestion, she met him in Pomona where he was teaching a dental course. Prior to this meeting, P.M. again, unsuccessfully requested a referral to another dentist. She was now dependent on Green and did what he said. They had sexual intercourse, he handed her roses, and then asked her to leave. P.M. did not immediately return to Green for treatment. He repeatedly called her at home. She returned to the office after he agreed not to touch or hug her anymore. P.M. had three more therapy sessions only because Green said her TMJ treatment could not progress without them. In July 1987, P.M. told Green she would not be returning to his office, the treatments were too confusing and the sexual part of the relationship had progressed too far. She lost 20 pounds and was distraught. P.M. subsequently filed a complaint with the Board.

*P.B.*

P.B. testified she was referred to Green in 1981 for dental treatment of a TMJ problem after an automobile accident. Almost immediately, Green gave

her craniosacral treatments. The sessions, P.B. testified, took place in a darkened treatment room in which soft meditation music was playing. She was positioned on her back in a curved dental chair. The first series of therapy sessions lasted approximately one and one-half years. In the course of the treatment, which usually lasted one hour, Green would give her a "pelvic lift" by putting his hand between her legs and around her sacrum and back. He also moved his fingers around her mouth and under her tongue. Green, P.B. testified, "worked [her] shoulders," but he neither touched her breast, put his hand over her pelvic or pubic area, nor hugged her. The treatments stopped when her TMJ improved.

In 1985, P.B. testified, she began a second series of craniosacral treatments as a result of two accidents. The treatments lasted until February 1986. During this time, she was coping with her mother's illness and her subsequent death. P.B. discussed with Green how her mother suffered and the toll her death took on her. P.B. noticed a difference in the treatments. Green started to make personal comments about her hair or jewelry. Toward the latter part of the sessions, P.B. testified, Green would stroke her forehead and arm. In addition to the hand Green placed between her legs and on her sacrum, he would now slowly move the other hand over her pelvic area. He kissed her forehead at the end of the sessions, and encouraged her to stay longer after treatments. The sessions, P.B. testified, took on sexual overtones and left her lightheaded at their conclusion. She trusted Green because he had helped her before, and he was a doctor and a professional. She began a personal relationship with him.

The first sexual contact with Green took place after a cranial treatment, late in the afternoon, and in his outer office. No one else was there. She and Green talked, and then they hugged and kissed. Green removed his clothes and P.B. removed her top. P.B. recalls Green staring at her breasts and telling her she was beautiful. Then she and Green left the office. After this incident, Green called her at home during the lunch hour, but did not discuss dental care. P.B. further testified she told Green his calls were making her life difficult because her husband was often home during these times. Green continued to call.

In another incident, P.B. testified that a few hours after another cranial treatment, Green took her to the Hollywood Roosevelt Hotel, a block from his office, and they had sexual intercourse. In a third incident, Green called P.B. at home and they arranged to meet at Charmer's Market in Santa Monica. When she arrived, P.B. testified, he handed her roses and they had dinner. Afterwards, they went to the Holiday Inn and engaged in sexual

activities. P.B. testified she then realized her personal involvement with Green was wrong and discontinued the sexual contact.

P.B. still considered Green her dentist. He also treated her son. When she returned for a teeth cleaning, Green handed her a greeting card that read "We can't go on *not* meeting like this . . . I miss you! . . . Love, E." She never discussed the card with Green. In 1988, P.B. testified, she had three additional craniosacral treatments because of a neck problem. She stopped seeing Green after expressing dissatisfaction with some of his dental work.

*Green*

Green testified to a sexual relationship with P.M., but denied any sexual encounters with P.B. He acknowledged giving P.B. compliments and a friendly hug and "peck" on the cheek, but did not think he stroked or kissed her forehead. He was equivocal about identifying the handwriting as his on the greeting card P.B. claimed he gave to her. In treating the two women, Green testified, he never pressed against or manipulated their breasts.

Green further testified he discussed with P.M. the use of craniosacral therapy as part of her treatment, but had no intentions of using the procedure as part of any romantic involvement with her. P.M. never told him she was troubled by his use of the therapy. He met P.M. outside the office. At City Cafe, P.M. told him she was in therapy but not that her father had died. Green further testified P.M. asked to meet him at Veterans Park only to discuss craniosacral therapy concepts. Furthermore, P.M. asked Green to meet her at her home. She wanted to discuss various craniosacral therapy and medical techniques. P.M., Green testified, initiated sexual contact, and with her help, he removed her clothes. He had sexual relations with P.M. in the hotel in Pomona, but when he told her he would not leave his family, she left. They had no further romantic involvement.

Green further testified P.M. never lost consciousness in the office during a therapy session, and it was common practice for his dental assistant to remain in the room during the therapy. He further testified his romantic involvement with P.M. had nothing to do with dentistry.

*Validity of the Board's Disciplinary Actions.*

The disciplinary action against Green was premised on section 726 which provided that " '[t]he commission of any act of sexual abuse, misconduct, or relations with a patient, client, or customer which is substantially related to the qualifications, functions, or duties of the occupation for which a license

was issued constitutes unprofessional conduct and grounds for disciplinary action . . . .' " (*Gromis* v. *Medical Board* (1992) 8 Cal.App.4th 589, 594 [10 Cal.Rptr.2d 452].) ■ " '[S]ection 726, which is a licensing provision, allows the licensing authority to discipline a [dentist] who engages in sexual acts with a patient only if it is "substantially related to the qualifications, functions, or duties of the occupation for which a license was issued . . . ." [Citation.]' [Citation.]" (*Id.* at p. 597.)

"[T]he statute does not bar all sexual relations with a patient—only activity which is 'substantially related to the qualifications, functions, or duties of the occupation.' " (*Gromis* v. *Medical Board, supra,* 8 Cal.App.4th at p. 594.) "Of course, nonconsensual sexual advances or touching has been upheld as a ground for discipline. [Citation.] Consensual sexual activity, too, has been found a legitimate basis for discipline when the sexual activity occurred under guise of treatment, as part of a physical examination, during psychiatric treatment or in exchange for drugs." (*Id.* at p. 595.)

The basis of Green's contention is that since his sexual relationship with P.M. was consensual and did not occur "under the guise of treatment," he could not be subject to discipline under section 726. He relies on *Atienza* v. *Taub* (1987) 194 Cal.App.3d 388 [239 Cal.Rptr. 454] and *Gromis* v. *Medical Board, supra,* to support his argument. We find these cases inapplicable to Green's position.

*Atienza* v. *Taub, supra,* 194 Cal.App.3d 388 is a medical malpractice case in which the plaintiff-patient alleged that during the course of treatment for an industrial injury, defendant-physician seduced her into having a sexual relationship. (*Id.* at p. 390.) After both the treatment and the relationship ended, she filed a medical malpractice action and alleged causes of action for professional negligence and willful misconduct. (*Ibid.*) The trial court granted defendant's demurrers without leave to amend and plaintiff appealed. (*Id.* at p. 391.) The appellate court rejected plaintiff's argument "that by initiating a sexual relationship with her while she was under his care, the defendant-doctor failed to meet the standard of care and violated Business and Professions Code section 726. The appellate court rejected the argument and [held] that a sexual relationship with a patient constitutes professional negligence 'only if the physician engaged in the sexual conduct on the pretext that it was a necessary part of the treatment for which the patient has sought out the physician.' [(*Atienza, supra,* at p. 392.)]" (*Gromis* v. *Medical Board, supra,* 8 Cal.App.4th at p. 596.) That is not our case.

In *Gromis* v. *Medical Board, supra,* Dr. Gromis was a family practitioner who began a sexual relationship with one of his patients, Tina M. (8

Cal.App.4th at pp. 592-593.) After terminating the relationship, Tina M. complained to the Board of Medical Quality Assurance, which filed an accusation charging Gromis with unprofessional conduct for engaging in sexual activity with a patient, in violation of section 726. (8 Cal.App.4th at pp. 591, 593.) After an administrative hearing, the board revoked the physician's license. (*Id.* at p. 591.) The trial court determined "Dr. Gromis's sexual relationship with Ms. M. related to the functions and the duties of a physician" as it arose from the physician-patient relationship and caused her injury, and denied the physician mandamus relief. (*Id.* at pp. 591-592, 598.) The appellate court reversed the trial court ruling and, on the facts of that case, determined there were insufficient findings "to support the legal conclusion that the sexual relationship had a bearing on the functions and duties of a physician." (*Id.* at p. 598.) Furthermore, the court found "no finding or evidence that it was plaintiff's status as her doctor that led to this injury." (*Ibid.*) The court remanded the matter "for further findings on whether plaintiff took advantage of his status as Ms. M.'s physician to induce Ms. M. into the relationship." (*Id.* at p. 600.)

Furthermore, the *Gromis* court considered the language from *Atienza* limiting liability under section 726 to "sexual conduct under guise of treatment" to be dictum, and declined to apply such standard to a disciplinary proceeding. (*Gromis* v. *Medical Board, supra*, 8 Cal.App.4th at pp. 597-598.) The court observed: "To take the approach urged by plaintiff presupposes that the only reason for proscribing physician-patient sexual activity is the potential for deception by the doctor. Hence, plaintiff reasons that when the patient has not been deceived there is no basis for discipline. Yet, plaintiff has overlooked other reasons for proscribing sexual activity: for example, the doctor may use his or her status to induce the patient's consent to sexual activity, or the doctor's medical judgment may be compromised by his or her sexual interest in the patient. Because situations can be contemplated where the physician's professional duties will affect or be affected by a sexual relationship with the patient, we decline to hold as a matter of law that only sexual conduct under guise of treatment can serve as grounds for discipline. Rather, the question must be decided on a case-by-case basis: whether under the circumstances the sexual conduct bears some relationship to the physician's qualifications, functions or duties." (*Id.* at pp. 597-598.)

Therefore, using this "case-by-case" analysis concept, Green cannot rely on *Atienza* to argue that because he did not tell P.M. or P.B. sexual activity was part of their treatment, his relationship with these women, "as a matter of law, had no bearing on his qualifications, duties or functions as a

[dentist]." (*Gromis* v. *Medical Board, supra*, 8 Cal.App.4th at p. 597.) Green cannot rely on *Gromis* for permission to engage in sexual relationships with his patients.

We agree with *Gromis* and find the determination of a section 726 violation is not limited to consideration of whether the physician, or, as in our case the dentist, engaged in a sexual relationship "under guise of treatment." (8 Cal.App.4th at p. 597.) We refuse to apply the language from *Atienza* regarding section 726 to this disciplinary proceeding for the reasons cited in *Gromis*.

In our case, there was substantial evidence to support a finding that Green used his status and authority to win his patients' trust, take advantage of their insecurities, and induce them to participate in a sexual relationship. The record reflects he misused the treatments to create an emotional environment to foster dependency and an illusion of trust. He used his knowledge of his patients' personal problems and his professional skills to play upon their emotional needs. During the times he found the women most vulnerable, Green incorporated erotic and manipulative touching of intimate parts of their bodies into the treatments. He then violated the patients' trust and exceeded the scope of their consent for treatment by seducing them into a sexual relationship. The facts do not support a finding of a consensual sexual relationship. The facts do support a finding that he abused his professional status and knowledge by inducing these women into sexual relationships. Such conduct, under the facts of this case, is substantially related to the functions and duties of a dentist and supports a finding of disciplinary action pursuant to section 726. There was substantial evidence to support the findings of the Board and of the trial court.

### DISPOSITION

On the appeal, we reverse the trial court's ruling to remand the laches issue to the Board, and order the trial court to enter a new and different judgment denying the petition for writ of mandate in its entirety.

On the cross-appeal, we find the trial court's decision to sustain the Board's disciplinary action was supported by substantial evidence, and affirm.

Each side to bear its own costs.

Klein, P. J., and Croskey, J., concurred.