827 A.2d 176

Thomas E. FINUCAN, Jr.

v.

**MARYLAND STATE BOARD OF PHYSICIAN QUALITY ASSURANCE.**

No. 1891, Sept. Term, 2001.

Court of Special Appeals of Maryland.

June 25, 2003.

400

Thomas E. Finucan, Jr., Elkton, for appellant.

Thomas W. Keech, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for appellee.

Before MURPHY, C.J., BARBERA and RAYMOND G. THIEME, JR. (Retired, specially assigned) JJ.

BARBERA, J.

This case presents the question whether the Board of Physician Quality Assurance ("the Board") could reasonably conclude that a physician's having consensual sexual relations with adult patients, at times and locations other than those involving the immediate act of diagnosis or treatment, is "immoral or unprofessional conduct in the practice of medicine" within the meaning of Maryland Code (1981, 2000 Repl. Vol.), § 14–404(a)(3) of the Health Occupations Article. We hold that the Board could so conclude.

## FACTS AND PROCEEDINGS

Appellant, Thomas E. Finucan, Jr., M.D., is a physician who from 1985 until 2001 worked as a family practitioner in Cecil County, Maryland. In addition to maintaining a private practice at his medical office in North East, Dr. Finucan worked evenings and weekends at Perry Point VA Medical Center, and was on staff at Union Hospital in Elkton.

On October 21, 1998, the Board received a written complaint from a patient, identified hereinafter as Patient A, that Dr. Finucan engaged in a sexual relationship with her while acting as her physician. The Board began investigating Patient A's complaint. The investigation disclosed that, from 1993 through 1998, Dr. Finucan engaged in a series of sexual and personal relationships with several patients while maintaining a physician-patient relationship with them.

Nearly one year later, the Board charged Dr. Finucan with immoral or unprofessional conduct in the practice of medicine. A seven-day evidentiary hearing was conducted by an Administrative Law Judge ("ALJ"). The ALJ made extensive fact findings, and concluded that Dr. Finucan had engaged in sexual relationships with three of his patients, Patients A, B, and D, while serving as their primary care physician.[1]

Patient A was fifty-two years old at the time of the hearing. She first sought medical treatment from Dr. Finucan in March 1993. In September 1995, Dr. Finucan began calling Patient A and eventually visiting her at her home in the evenings, occasionally after midnight. At the time, Patient A was in the midst of a separation from her husband.

By the end of 1995, Dr. Finucan and Patient A had begun a consensual sexual relationship. They engaged in sexual intercourse and other sexual activity at her house and at his house on Old Field Point Road.[2] In addition to vaginal intercourse,

---

1. The ALJ concluded that the Board had not proved similar charges involving a fourth patient, Patient C.

2. Patient A also testified that she and Dr. Finucan once had sexual relations at Perry Point VA Medical Center, while he was on duty as

Dr. Finucan wanted to have anal intercourse. He also frequently requested that Patient A perform oral sex on him, and that he be allowed to ejaculate in her mouth, so that "part of [him] will be with [her] all day." Patient A initially opposed these requests. Patient A testified that Dr. Finucan ignored her feelings and eventually "coerce[d]" her into doing these things she did not want to do.

Dr. Finucan also asked Patient A to seek reversal of a tubal ligation so that she could bear his child. Patient A did not acquiesce to this request.

Dr. Finucan insisted that he remain Patient A's physician while they were involved sexually. During this time, Dr. Finucan treated Patient A for several medical conditions, including a seizure disorder, high blood pressure, emotional problems, a shoulder injury, bee stings, and a sinus infection. On two occasions, Dr. Finucan delivered prescription medicine to Patient A's home after diagnosing her medical condition.

Except for a several-month break in late 1996 and early 1997, Dr. Finucan and Patient A continued their dual professional and sexual relationships until September 1997. In that month, he saw her as a patient for the last time. Their sexual relationship ended in the spring of 1998.

Patient A suffered psychological difficulties as a result of her sexual relationship with Dr. Finucan and began seeing a therapist. In October 1998, Patient A filed the complaint that prompted these proceedings.

Patient B was thirty-five years old at the time of the hearing. She first obtained medical care from Dr. Finucan in March 1995. About a year later, Patient B sought medical advice from him regarding a hip injury. During that office visit, Dr. Finucan discussed with Patient B his own personal stress and expressed interest in seeing her outside of the office. Approximately one week later, Dr. Finucan met Patient B in a park and confided in her about a relationship with

---

"Assistant Officer of the Day." The ALJ made no specific finding about this aspect of Patient A's testimony.

another woman (Patient D). Thereafter, Dr. Finucan occasionally telephoned Patient B while he was on duty at Perry Point VA Medical Center.

By the beginning of the summer of 1996, Dr. Finucan and Patient B had commenced a sexual relationship. The relationship continued for approximately six months. They engaged in sexual intercourse and other sexual activity at an apartment he maintained above his medical office and, on at least two occasions, at a local motel.[3]

As he did with Patient A, Dr. Finucan requested that Patient B engage in oral sex and that she swallow his ejaculate because, Dr. Finucan told Patient B, it "made us as one and it was part of him that would be with [her] for awhile." Patient B testified that she initially opposed the request, but Dr. Finucan "used his control over me and his position to have me do things that I really wouldn't even do with my husband."

At his insistence, Dr. Finucan continued to see Patient B as a patient. During medical office visits, Dr. Finucan would "touch [her] breasts and things like that," and "[they] would kiss." During that same period, Patient B convinced her husband that they should transfer their teenaged daughter's care to Dr. Finucan.

As he did with Patient A, Dr. Finucan asked Patient B to seek reversal of a tubal ligation so that she could bear his child. Patient B spoke to another doctor regarding the procedure, but did not commence the process.

Dr. Finucan last saw Patient B as a patient in March 1997, treating her at that time for anxiety. Dr. Finucan had ended their sexual relationship one month earlier, over Patient B's objection. Patient B began psychotherapy to deal with issues of distrust, shame, self-blame, and anger.

Patient D was forty years old at the time of the hearing. In late 1992, Patient D's husband visited Dr. Finucan for a

---

**3.** Patient B also testified that she and Dr. Finucan engaged in sexual intercourse at Perry Point VA Medical Center. The ALJ made no specific finding about this aspect of Patient B's testimony.

physical examination as part of the law enforcement officer application process. Dr. Finucan learned that Patient D's husband would be training for several months at the police academy on the Eastern Shore, returning home only on weekends.

In early 1993, Dr. Finucan began a sexual relationship with Patient D. At about the same time, Dr. Finucan became the primary care physician for Patient D, her husband, and her daughters. Later that year, Dr. Finucan hired Patient D to be his office receptionist.

Patient D did not testify at the hearing, but her former husband did. Sometime in 1993, he discovered, in their home, men's clothing and condoms that did not belong to him. Patient D's husband also testified that he found greeting cards from Dr. Finucan to Patient D, and a photograph of Dr. Finucan "snuggling" with Patient D's children. On one occasion, Patient D's husband found Dr. Finucan asleep in Patient D's bed.

Patient D's marriage dissolved as a result of her sexual relationship with Dr. Finucan. In February 1994, Patient D and Dr. Finucan began living together. Dr. Finucan asked Patient D to have his baby and to undergo fertility testing, which she agreed to do. Sometime thereafter, Patient D became pregnant with Dr. Finucan's child, but suffered a miscarriage. The two became engaged to be married. Throughout this time, Dr. Finucan continued to provide medical care to Patient D and her daughters.

In June 1995, Patient D took an overdose of prescription medication in an apparent suicide attempt and was admitted to Union Hospital. Hospital records show that Patient D listed Dr. Finucan as her family physician, that he served as her admitting and attending physician, and that he had significant involvement in her care while she was in the hospital. The records also show that Patient D was discharged from the hospital to Dr. Finucan's care.

Approximately one year later, Patient D and Dr. Finucan ended their sexual relationship.

Herbert L. Muncie, Jr., M.D., Chair of the Department of Family Medicine at the University of Maryland School of Medicine and an expert in physician-patient boundary issues and the ethical practice of medicine, testified as a witness for the Board. Dr. Muncie stated that boundaries are important in the physician-patient relationship, in part because of the powerful role that the physician plays in that relationship. Dr. Muncie explained that a patient may naturally develop warm feelings for the physician and consequently be unable to perceive clearly the role to which the physician must adhere. The physician, therefore, must take care not to exploit the advantage physicians naturally gain over their patients. Even in those cases in which a sexual relationship develops after termination of the physician-patient relationship, ethical concerns may arise, depending on the physician's knowledge about the patient's past, family situation, and emotional state. Dr. Muncie opined "that there is never ... any situation, where having a sexual relationship with a [current] patient is ever, ever appropriate."

Counsel for the Board entered into evidence the Board's spring 1993 newsletter and a *Journal of the American Medical Association* ("JAMA") article entitled *Sexual Misconduct in the Practice of Medicine,* both of which state that sexual contact that occurs simultaneously with the physician-patient relationship constitutes sexual misconduct on the physician's part. The JAMA article further states that a patient seeking medical care must be able to trust the physician's dedication solely to the patient's welfare. Moreover, a physician's romantic involvement with a patient could result in the physician's need for gratification, which interferes with the physician's ability to address the patient's needs.

Dr. Finucan testified at the hearing and admitted that he had a sexual relationship with Patients A and D, but only after they were no longer his patients. At the same time, Dr. Finucan acknowledged that he had occasionally provided emergency treatment to Patients A and D during their respective sexual relationships. Dr. Finucan denied ever having had a sexual relationship with Patient B.

In September 2000, the ALJ issued his "Revised Proposed Decision."[4] The ALJ found that the evidence against Dr. Finucan demonstrated "overwhelming[ly]" that he had pursued multiple sexual relationships with Patients A, B, and D over a period of several years. The ALJ found in particular that:

> [Dr. Finucan] exploited patients to whom he owed a fiduciary duty of trust and ethical responsibility. [Dr. Finucan] pursued patients, mindful of the imbalance of power and status, with the benefit of personal knowledge about the patients and their lives. [Dr. Finucan] undermined the trust patients must be able to place in their physicians. A physician is obligated to act only for a patient's benefit, without any thought of self-gratification.

From this and other findings, the ALJ concluded:

> The complicated and tangled series of involvements, some occurring simultaneously, with several women of itself is not unethical or immoral in the practice of medicine. However, when the evidence shows that three of those women were patients at the time [Dr. Finucan] was intimately involved with them, and that he undermined the trust of the physician-patient relationship, then that physician has violated the ethical obligations of his profession.

The ALJ further concluded that Dr. Finucan's conduct constituted unprofessional conduct in the practice of medicine. The ALJ recommended that Dr. Finucan's license to practice medicine be revoked and that his license not be considered for reinstatement for at least three years.

---

4. The ALJ had previously issued a "Proposed Decision," but its wording suggested that the ALJ had applied a preponderance of the evidence standard of proof. The Board issued a remand order requesting clarification. The ALJ issued a "Revised Proposed Decision" clarifying that he had employed the clear and convincing standard of proof that pertains to license revocation. *See* Md.Code (1981, 2000 Repl.Vol.), § 14–405(b) of the Health Occupations Article; *Solomon v. Board of Physician Quality Assurance,* 132 Md.App. 447, 453, 752 A.2d 1217, *cert. denied,* 360 Md. 275, 757 A.2d 811 (2000).

Dr. Finucan filed exceptions with the Board. After a hearing on December 21, 2000, the Board issued its final order adopting the ALJ's findings of fact and analysis, and adding the following:

Dr. Finucan has engaged in reprehensible unprofessional conduct in the practice of medicine by engaging in a pattern of unethical sexual relationships with his adult women patients over a period of several years. He repeatedly exploited patients to whom he owed a fiduciary duty of trust and ethical responsibility. This exploitation was devastating to both those patients and their families. Dr. Finucan has undermined the trust which patients must be able to place in their physicians.

The Board agreed with the ALJ's proposed sanction, adding that if Dr. Finucan should apply for reinstatement of his license, he must make "a clear and convincing showing to the Board not only of medical competence, but also of rehabilitation and a change in character, demonstrated by his conduct over a long period of time."

Dr. Finucan filed a petition for judicial review of the Board's order in the Circuit Court for Cecil County.[5] The case was transferred to the Circuit Court for Talbot County. After hearing arguments from Dr. Finucan and counsel for the Board, the court affirmed the Board's decision.

Dr. Finucan has appealed and presents eleven questions, which we have distilled into three:

I. Does a physician who engages in sexual relations with a patient concurrent with the physician-patient relationship commit immoral or unprofessional conduct in the practice of medicine?

II. Was there substantial evidence to support the Board's finding that Dr. Finucan had engaged in immoral or unprofessional conduct in the practice of medicine?

---

5. Dr. Finucan was represented by counsel at the hearings before the ALJ and the Board, but represented himself before the circuit court, and does so before this Court.

III. Did the administrative proceedings violate the *Accardi* doctrine, and was appellant otherwise deprived of due process?

## STANDARD OF REVIEW

 Appellate review of an administrative agency's decision is narrow. We are " 'limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law.' " *Board of Physician Quality Assurance v. Banks*, 354 Md. 59, 67–68, 729 A.2d 376 (1999) (quoting *United Parcel Serv., Inc. v. People's Counsel for Baltimore County*, 336 Md. 569, 577, 650 A.2d 226 (1994)). We review the agency's decision, not that of the circuit court. *Jordan Towing, Inc. v. Hebbville Auto Repair, Inc.*, 369 Md. 439, 450, 800 A.2d 768 (2002).

 We do not substitute our judgment for the administrative agency's expertise. *Banks*, 354 Md. at 68, 729 A.2d 376. "Even with regard to some legal issues, a degree of deference should often be accorded the position of the administrative agency." *Id.* at 69, 729 A.2d 376. "[T]he expertise of the agency in its own field should be respected." *Id.* Therefore, "an administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts." *Id.*

## DISCUSSION

### I.

In Maryland, the Board may reprimand, place on probation, or suspend or revoke a physician's license if that physician "[i]s guilty of immoral or unprofessional conduct in the practice of medicine." Md.Code (1981, 2000 Repl.Vol.), § 14–404(a)(3) of the Health Occupations Article.[6] Dr. Finucan

---

6. Hereinafter, all statutory references are to the Health Occupations Article (2000 Repl.Vol.), unless otherwise indicated.

does not contest that a physician's engaging in a sexual relationship with a current patient is immoral or unprofessional. Indeed, he admitted as much below, and does so again in his brief on appeal. He argues, instead, that the Board wrongly revoked his license to practice medicine because, when the sexual conduct with his patients occurred, he was not "actually or constructively engaged in the act of the practice of medicine." For the reasons that follow, we disagree.

## A.

As a preliminary matter, there was substantial evidence to support the Board's first-level findings that Dr. Finucan had sexual relationships with Patients A, B, and D while they were his patients. In addition, it was reasonable for the Board to conclude that Dr. Finucan's behavior was immoral and unprofessional conduct. The Board's spring 1993 newsletter and the JAMA article condemn sexual contact between a physician and a patient concurrent with the physician-patient relationship, and Dr. Muncie provided the expert opinion that a physician having a sexual relationship with a current patient is never appropriate. The prohibition against physician-patient sexual relations is part of at least one version of the Hippocratic Oath that is currently recited. *See* American Medical Association, Council on Ethical and Judicial Affairs, Council Rep., *Sexual Misconduct in the Practice of Medicine* (1991) 266 JAMA 2741 (quoting the Oath's prohibition of "all mischief and in particular of sexual relations with both female and male persons").

■ Moreover, the courts recognize that, "[i]n the medical profession, it is understood that having sex with patients constitutes immoral and unprofessional conduct." *Briggs v. Cochran,* 17 F.Supp.2d 453, 461 n. 18 (D.Md.1998), *aff'd without opinion,* 202 F.3d 257 (4th Cir.1999); *see Bash v. Board of Med. Practice,* 579 A.2d 1145, 1153 (Del.Super.Ct.1989) (noting that "[i]t cannot be seriously doubted that sexual exploitation of a patient by a physician constitutes dishonorable, unethical

or immoral conduct"); *Selkin v. State Bd. for Prof'l Med. Conduct*, 279 A.D.2d 720, 719 N.Y.S.2d 195, 196 (2001) (reaffirming that a physician is morally unfit to practice medicine when he engages in consensual sexual relationships with patients during the period of time he is treating them).

Indeed, in *McDonnell v. Comm'n on Med. Discipline*, 301 Md. 426, 436 n. 5, 483 A.2d 76 (1984), a case we return to later in our discussion, the Court of Appeals characterized the commission of a sex act on a patient as the "classic illustration of '[i]mmoral conduct of a physician.'" Finally, Dr. Finucan himself acknowledged at the hearing before the ALJ that it would have been inappropriate and unprofessional conduct in the practice of medicine to have had sexual relations with an individual while "she was still my patient."

The question here, however, is not whether Dr. Finucan's having sexual relations with his patients is immoral or unprofessional conduct, but whether engaging in those acts at times and places other than when he was directly diagnosing or treating them comes within the meaning of "in the practice of medicine." We believe that it does.

## B.

What "in the practice of medicine" means in the context of § 14–404(a)(3) was first considered by the Court of Appeals in *McDonnell*. The Court was asked to determine whether a physician who had attempted to intimidate witnesses scheduled to testify against him in a medical malpractice case could be disciplined for "[i]mmoral conduct of a physician in his practice as a physician," under Md.Code Ann. (1957, 1980 Repl.Vol.), Art. 43, § 130(h)(8), the predecessor to § 14–403(a)(3). *McDonnell*, 301 Md. at 428, 483 A.2d 76. The Court concluded that Dr. McDonnell's conduct, although "improper and not to be condoned," did not occur in his practice as a physician. *Id.* at 434, 483 A.2d 76. The Court held that "practice as a physician" referred to "matters pertaining essentially to the diagnosis, care or treatment of patients." *Id.* at 436, 483 A.2d 76. Consequently, immoral conduct that

simply occurs during the term of a physician's licensure or having only "a general or associative relationship to the physician in his capacity as a member of the medical profession" does not come within the statute's language. *Id.* At the same time, however, the Court noted: "Dr. McDonnell suggests, and we agree, that the classic illustration of '[i]mmoral conduct of a physician in his practice as a physician' is the commission · of a sex act on a patient, while the patient is under the doctor's care." *Id.* at 436 n. 5, 483 A.2d 76.

Approximately fifteen years later, in *Board of Physician Quality Assurance v. Banks,* the Court of Appeals again examined the phrase "in the practice of medicine" as it is now employed in § 14–404(a)(3). The Court rejected the argument that *McDonnell* should be read as precluding a physician from being sanctioned under the statute for committing acts of sexual harassment against colleagues in the workplace. *Banks,* 354 Md. at 72–73, 729 A.2d 376. The Court distinguished Dr. McDonnell's conduct, which occurred during judicial proceedings against him on charges of medical malpractice, from that of Dr. Banks, who engaged in the harassment of hospital personnel while he was on duty as a physician and in the working areas of the hospital. *Id.* Dr. Banks's conduct, the Court said, "has more than merely a 'general or associative relationship' to [his] capacity as a member of the medical profession." *Id.*

The Court specifically rejected, as illogical, Dr. Banks's argument that "a physician may only be sanctioned under § 14–404(a)(3) if he or she is in the immediate process of diagnosing, evaluating, examining or treating a patient and engaged in a non-clerical task." *Id.* at 73, 729 A.2d 376. Such an approach, the Court explained, would "render the statute inadequate to deal with many situations which may arise." The Court said:

> For example, Dr. Banks concedes that a physician could be disciplined for exposing himself while examining an x-ray to determine whether a patient broke a bone because this is actual diagnosis and thus falls within the practice of medicine. (Banks's reply brief at 15–16). On the other hand, if

the physician were to expose himself to a nurse in the hallway immediately before or after examining the x-ray, this would not be in the practice of medicine, and hence not within the purview of § 14–404(a)(3). This approach so narrowly construes § 14–404(a)(3) that it would lead to unreasonable results and render the statute inadequate to deal with many situations which may arise.

*Id.* The Court concluded that Dr. Banks's conduct was deleterious to the hospital working environment and a threat to patients' well being:

The Board was justified in holding that Dr. Banks's conduct posed a threat to patients, not only because a "hospital environment must at all times be conducive to the practice of medicine," but also because his conduct was a threat to the teamwork approach of health care which requires participation from a variety of hospital personnel in order to deliver effective patient care. In fact, the evidence shows that Dr. Banks's conduct affected the working environment so deleteriously that it caused hospital employees to avoid him. . . .

Obviously Dr. Banks's misconduct could easily have an adverse effect upon patient care.

*Id.* at 75, 729 A.2d 376.

■ *McDonnell* and *Banks* guide our decision in this case. Although certainly not the holding of *McDonnell,* the Court made clear in that case that a physician acts in the practice of medicine by committing a sex act on a patient "under the doctor's care." 301 Md. at 436 n. 5, 483 A.2d 76. *Banks,* in turn, suggests that if the physician's misconduct relates to the effective delivery of patient care, then it is in the practice of medicine. 354 Md. at 74, 729 A.2d 376.

Before delving further into the question whether Dr. Finucan's engaging in sexual relationships with his patients was "in the practice of medicine," we observe that the evidence indicates that, on at least several occasions, Dr. Finucan had sexual contact with Patients A and B either while he was "on duty" as a physician in a medical setting or while he was

directly treating them as patients. Patient A testified that she and Dr. Finucan had sexual intercourse while he was the Assistant Officer of the Day at Perry Point VA Medical Center. And Patient B testified that, during office visits, he would touch her breasts and kiss her. Had the Board relied solely on these instances of unprofessional conduct, we would not hesitate to conclude that the conduct occurred in the practice of medicine, by direct application of *McDonnell* and *Banks*. The Board's decision in this case, however, was based on the broader ground of the concurrence of the physician-patient and off-medical site sexual relationships between Dr. Finucan and Patients A, B, and D. We therefore must determine whether the Board was reasonably justified in so deciding.

Dr. Finucan urges a far narrower interpretation of the phrase "in the practice of medicine" than is required by either *McDonnell* or *Banks*. Dr. Finucan asserts that in order for his conduct to be in the practice of medicine, he would have had to engage in the sexual conduct with his patients while rendering medical treatment to them. If Dr. Finucan's argument is meant to suggest that the sexual contact had to occur in the immediate process of his diagnosing, caring for, or treating Patients A, B, and D, or performing some related clerical function, his argument is directly refuted by *Banks*. If Dr. Finucan's argument is meant to be that the sexual conduct must have occurred in medical environs and while he was "on duty" as a physician, this argument also fails, for several reasons.

First, Dr. Finucan's sexual relationships with these patients grew directly out of, were conducted over the same period of, and were entangled with their respective physician-patient relationships. For example, Dr. Finucan brought Patient A's medications to her home. And, during Patient D's hospitalization, which was while Patient D and her children resided in his home, Dr. Finucan served as her attending physician.

Second, Dr. Finucan exploited, to his own ends, the trust that his patients placed in him as their physician. In the cases

of Patients A and D, he took advantage not only of what he learned from them about their personal lives, but of what he knew to be their emotional vulnerability. Dr. Finucan knew, for example, of Patient A's pending separation from her husband and of her emotional instability. And, in pursuing his personal relationship with Patient D, he capitalized on his knowledge that Patient D's husband was in training on the Eastern Shore.

Third, Dr. Finucan risked losing (if he did not lose altogether) the objectivity that any physician must have when caring for patients. He was derelict in maintaining a professional relationship focused exclusively on the health and welfare of his patients. He subordinated his patients' needs to the gratification of his personal desires. Indeed, he went so far as to suggest that each woman undergo a procedure (in the case of Patients A and B, a surgical procedure) to facilitate their bearing his children.

Finally, Dr. Finucan damaged his patients emotionally. Both Patients A and B sought therapy after their relationships with Dr. Finucan concluded. And, although we do not know the reason for Patient D's apparent suicide attempt (because she did not testify), we do know that the attempt occurred while she and Dr. Finucan were cohabitating. Dr. Finucan's conduct runs afoul of the maxim *"primum non nocere"* or "first, do no harm." [7]

---

7. The origin of this maxim is somewhat murky. Some courts attribute the maxim to the Hippocratic Oath, *see Heinrich ex rel. Heinrich v. Sweet,* 118 F.Supp.2d 73, 92 (D.Mass.2000); *Thorburn v. Dep't of Corrs.,* 66 Cal.App.4th 1284, 1290 n. 6, 78 Cal.Rptr.2d 584 (1998), although no version of the Oath that we have found contains this phrase. Other courts attribute the maxim to Hippocrates himself (460(?)—377(?) B.C.), for whom the Oath is named, *see Gross v. Dep't of Health,* 819 So.2d 997, 1006 (Fla.Dist.Ct.App.2002) (Orfinger, J., concurring); *Mackowski v. Mackowski,* 317 N.J.Super. 8, 721 A.2d 12, 16 (Kestin, J., concurring) (N.J.Super.Ct.App.Div.1998); *see also Roe v. Wade,* 410 U.S. 113, 130–31, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (discussing the origin of the ancient Oath and its inclusion of the prohibition against abortion). One commentator attributes the phrase to Galen, a Roman physician who translated several of Hippocrates's writings. *See* William D. Weitzel, *A Later Addition to Hippocratic Oath,* Wall St. J., Nov.

As the facts of this case graphically illustrate, a physician's engaging in a sexual relationship with a patient—whether or not it occurs in the immediate act of diagnosis or treatment, or inside or outside of a medical setting, or while the physician is technically "on duty"—has a deleterious effect on the patient's welfare. *See Banks,* 354 Md. at 75, 729 A.2d 376. Dr. Finucan's conduct occurred while Patients A, B, and D were "under his care," *see McDonnell,* 301 Md. at 436 n. 5, 483 A.2d 76, and had far more than a mere "general or associative relationship to the physician in his capacity as a member of the medical profession," *see id.* at 436, 483 A.2d 76. The Board could and did readily conclude that such conduct is immoral and unprofessional conduct in the practice of medicine.

Cases from other jurisdictions reflect this view. In *Pons v. Ohio State Med. Bd.,* 66 Ohio St.3d 619, 614 N.E.2d 748, 751 (1993), the Supreme Court of Ohio upheld the medical board's order that a doctor was deficient in the overall care of his patient by entering into a sexual relationship with the patient "when he had reason to believe she was in a vulnerable, unstable, emotional state." Similarly, in *Gromis v. Med. Bd. of California,* 8 Cal.App.4th 589, 10 Cal.Rptr.2d 452, *review denied,* 1992 Cal. LEXIS 5101 (1992), a California appellate court recognized that a physician's engaging in a sexual relationship with a patient could be grounds for a cause of action for professional negligence if the "conduct bears some rela-

---

25, 1996, at A19. Regardless of its source, the maxim continues to be a precept familiar to every doctor of medicine. *See* C. Everett Koop, *Introduction,* 35 Duq. L.Rev. 1, 2 (1996) (stating that although not included in the Oath, the phrase *primum non nocere* "is irrevocably bound to the Hippocratic principle of the sanctity of human life"); *see also Borowski v. Von Solbrig,* 14 Ill.App.3d 672, 303 N.E.2d 146, 150 (1973) (identifying the maxim as the first principle of medicine), *aff'd,* 60 Ill.2d 418, 328 N.E.2d 301 (1975); *Boutte v. Jefferson Parish Hosp. Serv. Dist. No. 1,* 807 So.2d 895, 899 (La.Ct.App.2002) (noting that medical ethics require health care providers to "first, do no harm"), *writ denied,* 813 So.2d 1093 (La.2002); *In re Conroy,* 190 N.J.Super. 453, 464 A.2d 303, 314 (1983) (noting that "the physician's primary obligation is *primum non nocere:* First do no harm"), *rev'd on other grounds,* 98 N.J. 321, 486 A.2d 1209 (1985).

tionship to the physician's qualifications, functions or duties." *Id.* at 598, 10 Cal.Rptr.2d 452. The court recognized that "the doctor may use his or her status to induce the patient's consent to sexual activity, or the doctor's medical judgment may be compromised by his or her sexual interest in the patient," and that such conduct relates to the physician's "qualifications, duties or functions as a physician." *Id.* at 597, 10 Cal.Rptr.2d 452. Likewise, in *Haley v. Med. Disciplinary Bd.*, 117 Wash.2d 720, 818 P.2d 1062 (1991), the Supreme Court of Washington upheld the medical board's finding that a physician abused his professional status and "exploited his position of psychological power and authority over [his patient] in order to facilitate their improper sexual relationship," and thereby violated the statute proscribing "any act involving moral turpitude, dishonesty, or corruption relating to the practice of the person's profession." [8] *Id.* at 1066.

Here, the Board concluded that Dr. Finucan exploited his position of trust by engaging Patients A, B, and D in sexual relationships. Dr. Finucan did so, the Board found, mindful of the imbalance of power between him and his patients, and with knowledge of their medical history, family situation, and current physical and emotional state. Giving due deference to the Board's expertise in determining when physician conduct comes within the ambit of "the practice of medicine," we hold that the Board could reasonably conclude that Dr. Finucan's unprofessional conduct with regard to Patients A, B, and D occurred "in the practice of medicine." [9]

---

8. For a survey of cases involving disciplinary proceedings against physicians and dentists arising out of sexual activity with a patient, see Michael R. Flaherty, Annotation, *Improper or Immoral Sexually Related Conduct Toward Patient as Ground for Disciplinary Action Against Physician, Dentist, or other Licensed Healer*, 59 A.L.R.4th 1104 (1988).

9. The Board's revocation of Dr. Finucan's license to practice medicine is consistent with the sanction imposed by the Court of Appeals in *Attorney Grievance Comm'n of Maryland v. Goldsborough*, 330 Md. 342; 348, 624 A.2d 503 (1993), an attorney discipline case in which it had been established that attorney Goldsborough had kissed one former client, spanked another client, and repeatedly spanked his former secretary. The Court deemed it appropriate to order indefinite suspen-

## II.

Dr. Finucan contends that the record does not contain substantial evidence supporting the Board's decision to revoke his medical license. The focus of his contention is not so much on the lack of an evidentiary basis for the Board's decision that his conduct fell within the ambit of § 14–403(a)(3), but on certain perceived errors by the ALJ as the fact finder.

In applying the substantial evidence test, we decide " ' "whether a reasoning mind reasonably could have reached the factual conclusion the agency reached." ' " *Banks,* 354 Md. at 68, 729 A.2d 376 (citations omitted); *accord Stidwell v. Maryland State Bd. of Chiropractic Exam'rs,* 144 Md.App. 613, 616, 799 A.2d 444 (2002). We are mindful that an agency's decision is prima facie correct and presumed valid; consequently, we "defer to the agency's fact-finding and drawing of inferences if they are supported by the record." *Banks,* 354 Md. at 68, 729 A.2d 376.

Dr. Finucan argues that the ALJ employed the incorrect standard of proof in rendering his initial proposed decision. In light of the ALJ's clarification in his revised proposed

sion of Goldsborough's license to practice law "with the right to apply for reinstatement no sooner than two years from the date of this opinion, and only when he is able to persuade this Court that the conduct which necessitated his suspension will never be repeated." *Id.* at 366, 624 A.2d 503. In reaching this conclusion, the Court observed: "The attorney-client relationship is based on trust, with the client necessarily placing total trust in the attorney and the attorney pledging to act in the client's best interest. Goldsborough, by his conduct, failed to demonstrate his recognition of, and respect for, his clients' interest" and, when he chose to spank his secretary and kiss his client, Goldsborough "abused the power that accompanied his license to practice law." *Id.* at 364–65, 624 A.2d 503. The Court added that by "gratify[ing] his psychological or sexual need at his clients' expense, [Goldsborough] breached the trust indispensable to the attorney-client relationship." *Id.* at 365, 624 A.2d 503. The Court concluded: "These acts, combined with Goldsborough's exploitative and abusive behavior toward a secretary in his law office, harmed not only his victims, but also the profession and the entire judicial system." *Id.*

The trust inherent in the attorney-client relationship, and the concomitant power and obligations it places on the attorney, apply equally to the physician-patient relationship.

decision that he employed the proper standard of proof, *see supra* note 4, Dr. Finucan has nothing about which to complain at this juncture.

Dr. Finucan challenges the ALJ's finding "that sexual contact that occurs concurrent with the physician-patient relationship is improper." We have already discussed in detail the evidence from which the ALJ could find and the Board could reasonably conclude that Dr. Finucan's engaging his patients in sexual relationships was, at the very least, "improper." We need not repeat that evidence here.

Dr. Finucan complains that the ALJ did not appropriately assess the credibility of the witnesses. We again perceive no error. It is well settled that the credibility findings of an agency representative who sees and hears witnesses during an administrative proceeding are entitled to great deference on judicial review. *Anderson v. Dep't of Pub. Safety & Corr. Servs.*, 330 Md. 187, 217, 623 A.2d 198 (1993); *accord Gabaldoni v. Board of Physician Quality Assurance*, 141 Md.App. 259, 261–62, 785 A.2d 771 (2001) (noting that " 'where credibility is pivotal to the agency's final order, [the] *ALJ's findings based on the demeanor of witnesses are entitled to substantial deference and can be rejected by the agency only if it gives strong reasons for doing so* ' ") (quoting *Dep't of Health and Mental Hygiene v. Shrieves,* 100 Md.App. 283, 302, 641 A.2d 899 (1994)).

The ALJ wrote: "I would have to believe that several people are lying and/or mistaken if I am to accept the scenarios set forth by [Dr. Finucan] as true. I cannot accept [Dr. Finucan's] scenarios as anything other than self-serving, contradictory, untrue and inconsistent with the weight of the evidence." The Board gave the proper deference to the ALJ's credibility based determinations and so shall we. There is simply no reason, much less a strong reason, to disturb those findings.

Dr. Finucan also argues that the ALJ acted arbitrarily and capriciously in analyzing the evidence adduced at the

hearing. He contends that certain testimonial and documentary evidence should have been accorded different weight than that given it by the ALJ. We disagree.

 The ALJ had before him seventy exhibits and the testimony of sixteen witnesses. It was the ALJ's responsibility to resolve any conflicts in the evidence presented, and to draw inferences from that evidence. It was also for the ALJ, not us, to accord each item of testimonial and documentary evidence the weight it deserves. *Blaker v. State Bd. of Chiropractic Exam'rs*, 123 Md.App. 243, 259, 717 A.2d 964, *cert. denied*, 351 Md. 662, 719 A.2d 1261 (1998). The ALJ submitted a detailed opinion, including seventy-two findings of fact, all of which have a substantial evidentiary basis in the record. The Board accepted those fact findings and, based on them, concluded that Dr. Finucan committed the conduct proscribed by § 14–403(a)(3). There was no error.

### III.

 Dr. Finucan mounts due process challenges to the manner in which the Board conducted its investigation into Patient A's complaint, and to the conduct of the hearings before the ALJ, the Board, and the circuit court. He also asserts that the Board violated the *Accardi* doctrine, so named for the case in which the doctrine was recognized, *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954). All of these arguments, for one reason or another, are not properly preserved for our review.

Dr. Finucan raised no argument, either before the ALJ or the Board, that the manner in which this case was investigated violated due process or *Accardi*.[10] It was only at the circuit court hearing that Dr. Finucan first alluded, in an amorphous way, to procedural deficiencies in the administrative proceedings. In much the same way, he reasserts these contentions

---

10. The Court of Appeals recently adopted a modified version of the *Accardi* doctrine. *Pollock v. Patuxent Inst. Bd. of Review*, 374 Md. 463, 823 A.2d 626 (2003).

in his brief. Yet, he does not point to a place in the record where any of these matters surfaced, nor does he provide argument in support of the contentions on appeal.

These issues are not properly before us for review. It has consistently been held that "questions, including Constitutional issues, that could have been but were not presented to the administrative agency may not ordinarily be raised for the first time in any action for judicial review." *Board of Physician Quality Assurance v. Levitsky*, 353 Md. 188, 208, 725 A.2d 1027 (1999). Dr. Finucan's failure to raise before the Board any of his current complaints about the administrative agency's investigative and adjudicative process precludes his raising those complaints here. *Id.;* Md. Rule 8–131(a). We cannot consider these contentions for the additional reason that Dr. Finucan has failed to comply with the appellate rules concerning citation to the record and adequate supporting argument. *See* Md. Rule 8–504(a)(4),(5); *Honeycutt v. Honeycutt*, 150 Md.App. 604, 618, 822 A.2d 551 (2003) (holding that where a party does not adequately brief an argument, we need not address it on appeal).[11]

Dr. Finucan also argues that his due process rights were violated at the circuit court hearing. He asserts that the court did not consider his complaints about the manner in which Carol Palmer, the Board's compliance officer, conducted the investigation that led to the Board's charging him under § 14–403(a)(3); the court did not fairly consider all of the evidence; and the court was generally unprepared to conduct the hearing. As with his other due process complaints, however, Dr. Finucan has not provided us with any indication of where in the record we might look for these errors, nor does he offer any argument to support his assertions of error. Under these circumstances, we are in no position to address

11. Notwithstanding his *pro se* status, Dr. Finucan is required to adhere to the rules of appellate procedure. *Pickett v. Noba, Inc.*, 122 Md.App. 566, 568, 714 A.2d 212, *cert. denied*, 351 Md. 663, 719 A.2d 1262 (1998); *Tretick v. Layman*, 95 Md.App. 62, 68–69, 619 A.2d 201 (1993).

Dr. Finucan's concerns. *See* Md. Rule 8–504(a)(4),(5); *Honeycutt,* 150 Md.App. at 618, 822 A.2d 551.

We nevertheless note that we have reviewed the pleadings, hearing transcripts, and exhibits that make up the voluminous appellate record in this case. In the course of that review, we have not detected any form of due process violation or other procedural error, nor have we remotely sensed that Dr. Finucan received less than a full and fair hearing at each and every stage of the proceedings.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**