846 A.2d 377

Thomas E. FINUCAN, Jr.

v.

MARYLAND BOARD OF PHYSICIAN QUALITY ASSURANCE.

No. 71, Sept. Term, 2003.

Court of Appeals of Maryland.

April 5, 2004.

Reconsideration Denied May 6, 2004.

Thomas E. Finucan, Jr., Port Deposit, pro se petitioner.

Thomas W. Keech, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. on brief), Baltimore, for Respondent.

**580**

Argued Before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

HARRELL, Judge.

On 21 October 1998, Respondent, the Board of Physician Quality Assurance [1] ("the Board"), received a written complaint from a female patient of Thomas E. Finucan, Jr., M.D., Petitioner, alleging that Finucan engaged in a sexual relationship with her while concurrently acting as her physician. The subsequent investigation by the Board disclosed that, between 1993 and 1998, Finucan engaged in a series of sexual relationships with several female patients while maintaining, at the same time, a physician-patient relationship with them.

The Board charged Finucan with "immoral or unprofessional conduct in the practice of medicine." Following an administrative evidentiary hearing, an Administrative Law Judge (ALJ) of the Maryland Office of Administrative Hearings (OAH) concluded that Finucan had engaged in sexual relationships with three of his female patients during the time they were his patients. The ALJ recommended revocation of Finucan's license to practice medicine in Maryland. On 21 December 2000, the Board adopted the ALJ's findings and imposed license revocation as the appropriate sanction for the misconduct revealed by the facts.

Finucan sought judicial review of the Board's final order. After hearing oral argument, the Circuit Court for Talbot County affirmed the Board's decision. On direct appeal by Finucan, the Court of Special Appeals affirmed. We granted Finucan's petition for a writ of certiorari, *Finucan v. Board of Physicians*, 377 Md. 275, 833 A.2d 31 (2003), to consider the sole question posed in his petition:

Does a physician commit immoral or unprofessional conduct in the practice of medicine [ ] by engaging in consensual sexual activity with a patient concurrent with the existence

---

1. The Board since has been renamed the "State Board of Physicians." 2003 Md. Laws, Chap. 252.

of a physician-patient relationship, in the absence of evidence that such activity occurred while the physician was actually engaged in the treatment and care of the patient?

## I.

Petitioner was a physician who, from 1985 until 2001, practiced as a family practitioner in Cecil County, Maryland. He maintained a private practice from a medical office in North East, was on the staff at Union Hospital in Elkton, and also worked at Perry Point Veterans Medical Center.

This case commenced on 21 October 1998 when the Board received a written complaint from a female patient ("Patient A") alleging that Finucan engaged in a sexual relationship with her while acting as her physician. The subsequent investigation of the complaint by the Board suggested that, from 1993 through 1998, Finucan engaged in a series of sexual relationships with several then current patients.

### A. Administrative Proceedings

The Board charged Finucan on 30 September 1999 with "immoral or unprofessional conduct in the practice of medicine" under the Maryland Medical Practice Act ("the Act"), Md.Code (1981, 1994 Repl.Vol.), § 14–404(a)(3) of the Health Occupations Article.[2] A seven-day evidentiary hearing was conducted before an ALJ. After hearing from fifteen witnesses and considering seventy exhibits, the ALJ issued a Revised Proposed Decision[3] concluding that Finucan violated

---

**2.** Maryland Code (1981, 2000 Repl.Vol., 2003 Supp.), § 14–404(a)(3) of the Health Occupations Article, at all relevant times and in pertinent part, read as follows:

 (a) Subject to the hearing provisions of § 14–405 of this subtitle, the Board, on the affirmative vote of a majority of its full authorized membership, may reprimand any licensee, place any licensee on probation, or suspend or revoke a license if the licensee:

 (3) Is guilty of immoral or unprofessional conduct in the practice of medicine

**3.** The ALJ earlier issued a "Proposed Decision" suggesting that he applied a preponderance of the evidence standard of proof to the

the Act by engaging in sexual relationships with three female patients—Patients A, B, and D—while concurrently maintaining physician-patient relationships. The ALJ also concluded, however, that the Board had not proved similar charges involving Patient C. Finucan filed written Exceptions with the Board. After an exceptions hearing, the Board issued its Final Decision and Order on 24 January 2001, adopting the Revised Proposed Decision of the ALJ and revoking Finucan's license to practice medicine.

*Facts Found as to Patient "A"*

The Board found that Finucan began an intimate sexual relationship with Patient A during 1995 at a time when he also was treating her for a seizure disorder, high blood pressure, and emotional problems. Patient A initially consulted Finucan as her physician in 1993 for emotional difficulties following a separation from her second husband. Finucan began calling Patient A at home in September 1995, while she was a still a patient, to give her medical test results. He continued to call her at home, ultimately asking for and receiving directions to her house. He then began visiting her in the evenings and the two began a consensual sexual relationship before the end of 1995.

During the intimate relationship, Finucan requested that Patient A have her tubal ligation reversed so that she could bear his child. In addition, he assisted Patient A in having her driving privilege reinstated, writing a supporting letter, dated 15 December 1995, toward that end. Patient A viewed Finucan as "her champion" in this effort. In June 1996, during the course of Patient A's treatment by Finucan for high blood pressure, Patient A became dissatisfied with her treatment and caused her patient file to be transferred to

---

evaluation of the Board's evidence. The Board remanded the matter to the ALJ requesting clarification of this point. The ALJ issued a "Revised Proposed Decision" clarifying that he actually employed the clear and convincing standard of proof required in a license revocation matter. *See* Md.Code (1981, 2000 Repl.Vol., 2003 Supp), § 14–405(b) of the Health Occupations Article.

another doctor for his review. The intimate relationship ceased for a couple of months beginning in June 1996, when the parties had a falling out, but resumed again.

In June 1997, Patient A went with a hurt shoulder for an office visit with Finucan. Subsequently, he brought drug samples to Patient A's home to treat her shoulder. Sometime during 1997 or 1998, Finucan also brought antibiotics to Patient A's home to treat her sinus infection. Finucan and Patient A continued their parallel professional and sexual relationships until September 1997. In September, he saw her as a patient for the last time, treating her for multiple bee stings. In approximately the Spring of 1998 the intimate relationship between Finucan and Patient A ended. As a result of psychological difficulties arising out of Patient A's intimate relationship with Finucan, she began seeing a therapist in July 1998.

*Facts Found as to Patient "B"*

In the Spring of 1996, Patient B visited Finucan at his medical office, complaining of a hip injury. They flirted at that time and made arrangements to meet at a park a few days later. Approximately five weeks after first treating Patient B for her hip injury, Finucan began having a sexual relationship with her. Some of the sexual encounters occurred at an apartment that Finucan maintained adjacent to his medical practice. Patient B was married at the time, and her husband was also a patient of Finucan. Patient B convinced her husband that they should transfer their teen-age daughter's care to Finucan as well.

During the intimate relationship, Finucan requested Patient B to bear a child by him. Patient B responded that she previously underwent a tubal ligation and was unable to conceive. Nevertheless, Patient B visited another doctor to inquire about a tubal ligation reversal, but did not follow through with the process. Finucan and Patient B continued their parallel professional and sexual relationships until February 1997, when they had sexual relations for the last time. Patient B continued, however, as his patient, being treated for

anxiety in March 1997. Finucan ended the intimate relationship with Patient B against her will. Patient B had a difficult time dealing with the break-up and reacted by pursuing Finucan, following him around, appearing at his home and office uninvited and unwelcome. After ending her intimate relationship with Finucan, Patient B received psychotherapy to deal with sequelae issues of distrust, shame, self-blame, and anger.

### Facts Found as to Patient "D"

Finucan was the primary care physician for Patient D, her husband, and their three daughters. Finucan, married at the time himself, was able to initiate a sexual relationship with Patient D by using knowledge gained from his physician-patient relationship with her husband. Patient D's husband visited Finucan for a physical examination as part of a government job application process. Finucan learned from him that he would be away from home at training for several months, returning only on weekends. In early 1993, while Patient D's husband was away, Finucan began his sexual relationship with Patient D. On one occasion, Patient D's husband returned home and found Finucan sleeping in the marital bed. Patient D's marriage crumbled as a direct result of Finucan's sexual relationship with her.

In the Fall of 1993, Patient D began working for Finucan in his medical office as a Registered Nurse. During the intimate relationship, Finucan asked Patient D to have his baby. In 1994, Patient D moved in with Finucan. She underwent fertility testing at his request. Finucan became engaged to Patient D while continuing to provide medical care to her and her family.

In early June 1995, Patient D took an overdose of a prescription medication in an apparent suicide attempt and was admitted to the Intensive Care Unit at Union Hospital. At that time, she listed Finucan as her family physician. Finucan was the admitting and attending physician and had significant involvement in her care for the overdose. She was discharged from the hospital to Finucan's continuing care.

Approximately one year later, Patient D and Finucan ended their sexual relationship.

## Expert Testimony

Herbert L. Muncie, Jr., M.D., Chair of the Department of Family Medicine at the University of Maryland School of Medicine and an expert in physician-patient boundary issues and the ethical practice of medicine, testified as the Board's witness before the ALJ. Dr. Muncie testified that boundaries are important in the physician-patient relationship, in part because of the powerful role that the physician plays in that relationship. He observed that a patient may develop warm feelings for the physician and consequently be unable to perceive clearly the proper role to which the physician must adhere ethically and medically. The physician, therefore, must take care not to exploit the advantage he or she naturally may gain over his or her patients.

The ALJ also received in evidence, at the Board's behest, the Board's Spring 1993 newsletter article entitled *Sexual Misconduct in the Practice of Medicine* (the Board's newsletter is disseminated quarterly to all physicians licensed in the State of Maryland) and a *Journal of the American Medical Association* article also entitled *Sexual Misconduct in the Practice of Medicine,* 19 JAMA 2741 (1991), both of which state that sexual contact that occurs concurrently with the physician-patient relationship constitutes sexual misconduct on the physician's part.

## ALJ's Findings and Conclusions

The ALJ, in September 2000, found in his written findings of fact and conclusions of law that the evidence was "overwhelming" that Finucan "pursued multiple sexual relationships with his female patients over a period of several years." In particular, the ALJ found that

"[Finucan] exploited patients to whom he owed a fiduciary duty of trust and ethical responsibility. [Finucan] pursued patients, mindful of the imbalance of power and status, with the benefit of personal knowledge about the patients and

their lives. [Finucan] undermined the trust patients must be able to place in their physicians. A physician is obligated to act only for a patient's benefit, without any thought of self-gratification.

\* \* \*

"The complicated and tangled series of involvements, some occurring simultaneously, with several women of itself is not unethical or immoral in the practice of medicine. However, when the evidence shows that three of those women were patients at the time [Finucan] was intimately involved with them, and that he undermined the trust of the physician-patient relationship, then that physician has violated the ethical obligations of his profession. I find [Finucan] violated § 14–404(c)(3) and the standard of care by having sexual relations with Patients A, B, and D during the same period of time he was acting as their physician."

The ALJ concluded that Finucan's conduct constituted unprofessional conduct in the practice of medicine and recommended that his license to practice medicine be revoked for at least three years. Finucan filed exceptions with the Board.

### The Board's Findings and Conclusions

After a hearing on 21 December 2000, the Board issued its final order adopting the ALJ's findings of fact and analysis, and added the following:

"Dr. Finucan has engaged in reprehensible unprofessional conduct in the practice of medicine by engaging in a pattern of unethical sexual relationships with his adult women patients over a period of several years. He repeatedly exploited patients to whom he owed a fiduciary duty of trust and ethical responsibility. This exploitation was devastating to both those patients and their families. Dr. Finucan has undermined the trust which patients must be able to place in their physicians.

"For the protection of public health and safety, and in order to protect the integrity of the medical profession, Dr.

Finucan must be barred from practicing medicine in the State of Maryland.

"The Board agrees with the ALJ that Dr. Finucan's aberrant behavior is deeply ingrained. The Board believes that a significant amount of time must pass before behavior this deeply ingrained can be successfully and permanently modified. The Board concludes that nothing short of revocation of Dr. Finucan's medical license, and a three-year bar to the submission and consideration of any reinstatement application, will protect the integrity of the profession, as well as the health, safety, and welfare of the citizens of the State of Maryland. The Board also intends this sanction to serve as a deterrent to such egregious conduct on the part of any other licensee."

### B. Circuit Court Review

On 31 January 2001, Finucan, pursuant to the Administrative Procedure Act, Maryland Code (1984, 1999 Repl.Vol., 2003 Supp.), § 10–222 of the State Government Article, filed in the Circuit Court for Cecil County a petition for judicial review of the Board's order. The case was transferred to the Circuit Court for Talbot County. After hearing arguments from Finucan and the Board, the Circuit Court found that

[Finucan] engaged in a series of inappropriate sexual relationships with at least three of his female patients while he was acting in his capacity as their treating physician. The Court further finds that these inappropriate sexual relationships, while acting in his capacity as the patient's physician, falls within the meaning of the term "practicing medicine" under the Statute [in the] Health Occupations Article, Sections 14–401 et sec. (Supp.1999).

The Circuit Court concluded that substantial evidence existed in the record to support the action of the Board and affirmed its decision.

### C. In the Court of Special Appeals

In the Court of Special Appeals, Finucan argued that a physician who engages in sexual relations with current pa-

tients is not committing "immoral or unprofessional conduct in the practice of medicine." He also maintained that there was a lack of substantial evidence to support the Board's finding that he had engaged in "immoral or unprofessional conduct in the practice of medicine." In addition, Finucan argued that the Board had violated the *Accardi* doctrine and he was otherwise deprived of due process.

The Court of Special Appeals affirmed the Circuit Court's judgment. *Finucan v. Maryland State Bd. of Physician Quality Assurance*, 151 Md.App. 399, 827 A.2d 176 (2003). The intermediate appellate court concluded "there was substantial evidence to support the Board's first-level findings that Finucan had sexual relationships with Patients A, B, and D while they were his patients." The court reasoned that the facts illustrated that "a physician's engaging in a sexual relationship with a patient—whether or not it occurs in the immediate act of diagnosis or treatment, or inside or outside of a medical setting, or while the physician is technically 'on duty'—has a deleterious effect on the patient's welfare." Based on the imbalance of power between Finucan and his patients, and his knowledge of his patients' medical histories, family situations, and current physical and emotional states, the intermediate appellate court held as correct the Board's conclusion that Finucan's unprofessional conduct with regard to Patients A, B, and D occurred in the practice of medicine. Finally, the court noted that Finucan's allegations regarding the *Accardi* doctrine and due process, even as amorphous as presented there, had not been raised before the ALJ or Board and, thus, were deemed waived for judicial review purposes. In any event, based on its review of the voluminous appellate record, no due process violations or prejudicial procedural errors were revealed.

## II.

As a preliminary matter, we note that Finucan, in his petition for writ of certiorari filed with this Court, presented only the following question:

Does a physician commit immoral or unprofessional conduct in the practice of medicine [ ] by engaging in consensual sexual activity with a patient concurrent with the existence of a physician-patient relationship, in the absence of evidence that such activity occurred while the physician was actually engaged in the treatment and care of the patient?

As noted earlier, we granted the petition to consider this question. In his brief in this Court, however, he also presented a series of additional questions, arguing that

the administrative bias and various tactics violated the safeguards inherent in the Accardia [sic] Doctrine . . . Due Process Violations: Appellant's due process rights were violated as well as his constitutional rights. His sixth amendment rights were violated by not allowing him to be confronted by Patient D. There was a violation of Appellant's first amendment rights. Appellant was deprived of his guarantees of life, liberty, and the pursuit of happiness.

For a number of reasons, we shall not consider formally Finucan's *Accardi* argument or his additional due process questions. First, he failed to raise them before the ALJ or the Board. "We have held, consistently, that questions, including Constitutional issues, that could have been but were not presented to the administrative agency may not ordinarily be raised for the first time in an action for judicial review." *Bd. of Physician Quality Assurance v. Levitsky*, 353 Md. 188, 208, 725 A.2d 1027, 1036 (1999) (citations omitted). Finucan waived, under Rule 8–131(a), his right to have his additional questions considered on judicial review. Furthermore, he waived any constitutional and procedural issues for review in this Court by failing to raise them properly in his petition for writ of certiorari. This Court ordinarily will not consider issues not raised in a petition for writ of certiorari and, therefore, we will not consider Finucan's *Accardi* doctrine argument or due process arguments because they are not properly before us. *See, e.g., Calvert Joint Venture # 140 v. Snider*, 373 Md. 18, 31 n. 8, 816 A.2d 854, 861 n. 8 (2003) (finding that only two of petitioner's questions dealt with issues comprised in the questions to which the Court granted

certiorari and, therefore, two other questions not raised in the writ of certiorari were not properly before the Court); *Huger v. State*, 285 Md. 347, 354, 402 A.2d 880, 885 (1979) (holding that the question in petitioner's brief was not properly before the Court, because that same question was not included within the writ of certiorari granted by the Court).

## A. Standard of Review

■ It is well settled that the State Judiciary's role in reviewing an administrative agency's adjudicatory decision is limited, *United Parcel Service, Inc. v. People's Counsel*, 336 Md. 569, 576, 650 A.2d 226, 230 (1994); it "is limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law." *United Parcel*, 336 Md. at 577, 650 A.2d at 230. *See also* Md.Code (1984, 1995 Repl.Vol.), § 10–222(h) of the State Gov't Article. "Even with regard to some legal issues, a degree of deference should often be accorded the position of the administrative agency." *Bd. of Physician Quality Assurance v. Banks*, 354 Md. 59, 69, 729 A.2d 376, 381 (1999). We, therefore, ordinarily give considerable weight to the administrative agency's interpretation and application of the statute that the agency administers. *Lussier v. Md. Racing Comm'n*, 343 Md. 681, 696–97, 684 A.2d 804, 811–12 (1996), and cases there cited; *McCullough v. Wittner*, 314 Md. 602, 612, 552 A.2d 881, 886 (1989) ("The interpretation of a statute by those officials charged with administering the statute is ... entitled to weight."). Furthermore, the expertise of the agency in its own field of endeavor is entitled to judicial respect. *Fogle v. H & G Restaurant, Inc.*, 337 Md. 441, 455, 654 A.2d 449, 456 (1995); *Christ v. Dep't of Natural Res.*, 335 Md. 427, 445, 644 A.2d 34, 42 (1994) (legislative delegations of authority to administrative agencies will often include the authority to make "significant discretionary policy determinations"); *Bd. of Ed. For Dorchester Co. v. Hubbard*, 305 Md. 774, 792, 506 A.2d 625, 634 (1986) ("application of the

State Board of Education's expertise would clearly be desirable before a court attempts to resolve the" legal issues).

## B.

 Finucan initially contends that the prohibition of "immoral or unprofessional conduct" contained in Maryland Code (1981, 2000 Repl.Vol., 2003 Supp.), § 14–404(a)(3) of the Health Occupations Article is, on its face, unconstitutionally vague. This is so, he claims, because the statute does not prohibit explicitly a physician from engaging in sexual relations with patients, nor fairly warn the physician that such conduct falls within its proscription. Before considering this vagueness argument, we note, as the Court of Special Appeals similarly concluded, that there is no dispute in Maryland that physicians having sexual relationships with persons who are concurrently their patients is immoral or unprofessional conduct. Twenty years ago, in *McDonnell v. Commission on Medical Discipline*, 301 Md. 426, 436 n. 5, 483 A.2d 76, 80 n. 5 (1984), we opined that "the classic illustration of 'immoral conduct of a physician in his practice as a physician' is the commission of a sex act on a patient, while the patient is under the doctor's care." At the hearing before the ALJ, even Finucan acknowledged that it would have been inappropriate and unprofessional conduct in the practice of medicine to have had sexual relations with an individual while "she was still my patient."

 The void for vagueness contention finds conceptual nourishment in the Fourteenth Amendment's guarantee of procedural due process. *Williams v. State*, 329 Md. 1, 8, 616 A.2d 1275, 1278 (1992). Generally, courts employ two criteria in their analysis of whether a statute is void for vagueness. *Bowers v. State*, 283 Md. 115, 120–21, 389 A.2d 341, 345 (1978). First, a court determines whether the statute adheres to the "fair notice principle." *Bowers*, 283 Md. at 121, 389 A.2d at 345. In discussing the fair notice principle, we have held that "[d]ue process commands that persons of ordinary intelligence and experience be afforded a reasonable opportunity to know

what is prohibited, so that they may govern their behavior accordingly." *Id.* Thus, a statute will survive a challenge that it is unconstitutionally vague if it uses plain language that is understandable to a person of ordinary intelligence. *Connally v. General Const. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926); *Williams,* 329 Md. at 8, 616 A.2d at 1278; *Unnamed Physician v. Comm'n on Medical Discipline,* 285 Md. 1, 15, 400 A.2d 396, 403 (1979).

The next touchstone in the analysis counsels that a statute may be stricken for vagueness if it does not "provide legally fixed standards and adequate guidelines for police, judicial officers, triers of fact, and others whose obligation it is to enforce, apply and administer the penal laws." *Bowers,* 283 Md. at 121, 389 A.2d at 345. The purpose behind this second factor is to avoid resolving matters in an arbitrary or discriminatory manner. *Id.* (quoting *Grayned v. City of Rockford,* 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2299, 33 L.Ed.2d 222 (1972)). A statute, however, is not void for vagueness "merely because it allows for the exercise of some discretion." *Bowers,* 283 Md. at 122, 389 A.2d at 346. A statute is unconstitutional only when it "is so broad as to be susceptible to irrational and selective patterns of enforcement. . . ." *Id.*

In *Unnamed Physician v. Commission on Medical Discipline,* we addressed whether former Maryland Code (1957, 1978 Cum.Supp.), Art. 43 § 130, which at that time governed disciplinary actions against physicians, was void for vagueness.[4] Former section 130(h) identified eighteen separate grounds for which a physician could be disciplined for "unprofessional conduct," one of which was "professional incompetency." We held that the statute was not void for vagueness because it (1) sufficiently informed physicians that if they engaged in any of the activities forbidden by § 130(h) they would be subject to discipline and the possible loss of their license, and (2) because it was written in plain language which

---

4. In 1981, Article 43 was recodified, in part, in the Health Occupations Article of the Maryland Code. Section 130(h) is now § 14–404 of that article.

could be understood by persons of ordinary intelligence. *Unnamed Physician v. Comm'n on Medical Discipline,* 285 Md. 1, 14–15, 400 A.2d 396, 403 (1979). *See also Blaker v. State Bd. of Chiropractic Exam'rs,* 123 Md.App. 243, 255, 717 A.2d 964, 971 (1998) (professional disciplinary statute not void for vagueness merely because it allows for the exercise of some discretion by health disciplinary board).

Terms such as "unprofessional conduct" generally are sufficiently definite to withstand constitutional scrutiny if they are "susceptible to common understanding by members of the [regulated] profession." *Chastek v. Anderson,* 83 Ill.2d 502, 48 Ill.Dec. 216, 416 N.E.2d 247, 251 (1981). The meaning of terms such as "immoral conduct" and "dishonorable conduct" is determined by the "common judgment" of the profession as found by the professional licensing board. *Kansas State Bd. of Healing Arts v. Acker,* 228 Kan. 145, 612 P.2d 610, 615 (1980) (professional disciplinary statutes that specify a physician's license can be revoked for "unprofessional," "dishonorable," or "immoral" conduct in the practice of medicine have "been sustained by the courts in almost every instance") (citation omitted). *Cf. Haley v. Medical Disciplinary Bd.,* 117 Wash.2d 720, 818 P.2d 1062, 1074 (1991) (the statutory term "moral turpitude" is sufficiently clear to give adequate notice to members of the medical profession that consensual physician-patient sex is prohibited).

A statute prohibiting "unprofessional conduct" or "immoral conduct," therefore, is not per se unconstitutionally vague; the term refers to "conduct which breaches the rules or ethical code of a profession, or conduct which is unbecoming a member in good standing of a profession." *Shea v. Bd. of Medical Exam'rs,* 81 Cal.App.3d 564, 146 Cal.Rptr. 653, 660 (1978). *See also Pietsch v. Minnesota Bd. of Chiropractic Exam'rs,* 662 N.W.2d 917, 923–24 (Minn.App.2003) ("unprofessional conduct" is, of itself, a sufficiently definite ground upon which a board may revoke a license even in the absence of regulations defining what constitutes "unprofessional conduct"); *Lugo v. New York State Dep't of Health,* 306 A.D.2d 766, 762 N.Y.S.2d 660, 662 (2003) (a physician's consensual sexual relationship

with a patient demonstrates a moral unfitness to practice the profession).

The record in this case contains evidence that the prohibition against a physician engaging in sex with a current patient is commonly understood within the medical profession. At the administrative hearing, the Board's medical expert, Dr. Muncie, was asked how long ago the prohibition on patient-physician sex was established. He testified that "it is mentioned basically in the Hippocratic Oath that you should not basically take advantage of your patients, certainly not have sexual contact with your patients. It goes back thousands of years." The ancient or classical Hippocratic Oath, although not a basis for the discipline meted out in this case, is an expression of ideal conduct for physicians.[5] *See Andrews v.*

---

5. The classical Hippocratic Oath varies somewhat according to the particular translation. One classical version of the Hippocratic Oath states, "In every house where I come, I will enter only for the good of my patients, keeping myself far from all intentional ill-doing and all seduction, and especially from the pleasures of love with women and men." See Hippocrates, Physician's Oath in STEADMAN'S MEDICAL DICTIONARY, 579 (22d ed.1972). Another classical version of the Hippocratic Oath states, "[I] will come for the benefit of the sick, remaining free of all intentional injustice, of all mischief and in particular of sexual relations with both female and male persons...." Maura L. Campbell, *The Oath: An Investigation of the Injunction Prohibiting Physician–Patient Sexual Relations,* 32 PERSP. IN BIOLOGY & MED. 300 (1989) (setting forth entire text of one version of the Hippocratic Oath). *See also* 23 THE NEW ENCYCLOPEDIA BRITANNICA 889 (15th ed.1990) (containing different translation of the Hippocratic Oath). The modern Hippocratic Oath evolved from the classical version and is an ethical guide for the medical profession. It bears the name of the Greek physician Hippocrates (460(?)–377(?) B.C.). *See Roe v. Wade,* 410 U.S. 113, 130–32, 93 S.Ct. 705, 715–16, 35 L.Ed.2d 147 (1973) (noting that scholars debate the importance and acceptance of the original Hippocratic Oath by Greek physicians and argue about whether the Hippocratic Oath is an absolute standard of medical conduct). The vast majority, however, of modern versions of the Hippocratic Oath taken at medical schools do not forbid expressly sexual contact with patients. *See, e.g.,* David Graham, *Revisiting Hippocrates: Does an Oath Really Matter?,* 284 JAMA 2841 (2000) (citing text of traditional and modern versions of the Hippocratic Oath); Orr R.D., Pang N., Pellegrino E.D., Siegler M., *Use of the Hippocratic Oath: A Review of Twentieth Century Practice and a Content Analysis of Oaths Administered in Medical Schools in the U.S. and Canada in 1993,* 8(4) J. of Clinical Ethics 374–85 (Winter 1997) (finding in a survey of 157 U.S. and Canadian Medical Schools that

*United States,* 732 F.2d 366, 368 n. 2 (4th Cir.1984) ("the [classical] Hippocratic Oath is indicative of the medical profession's historic knowledge of and concern about the potential for sexual abuse of the physician-patient relationship"). More recently, the American Medical Association's Council on Ethical and Judicial Affairs concluded that "sexual contact or a romantic relationship concurrent with the physician-patient relationship is unethical." Council on Ethical and Judicial Affairs, American Medical Association, *Sexual Misconduct in the Practice of Medicine,* 19 JAMA 2741 (1991). Similarly, the U.S. District Court for the District of Maryland has opined that "[i]n the medical profession, it is understood that having sex with patients constitutes immoral and unprofessional conduct." *Briggs v. Cochran,* 17 F.Supp.2d 453, 460 n. 18 (D.Md. 1998). Even Finucan, in his petition for writ of certiorari here, admitted that his conduct was "immoral or unprofessional." He conceded that as he admitted below, Petitioner exercised poor judgment in his decision to enter into consensual sexual relationships with women who were then his patients. Petitioner concedes that such conduct would by most definitions qualify as "immoral" or "unprofessional. . . ." The statutory prohibition against "immoral or unprofessional conduct" was sufficient to warn Finucan and other physicians licensed to practice in Maryland that having sex with patients is prohibited.

■ Finucan next argues that his having sex with his female patients was not accomplished "in the practice of medicine" as that term is used in Maryland Code (1981, 2000 Repl.Vol., 2003 Supp.), § 14–404(a)(3) of the Health Occupations Article. This argument also is without merit. A parallel sexual relationship between a physician and a patient compromises the physician-patient relationship, violates the ethics of the medical profession, and reflects on the fitness of the

only 3 percent of all the modern Hippocratic Oaths in use retain a proscription against sexual contact with patients). It is not clear from the record of this case what, if any, version of the Hippocratic Oath Finucan may have sworn at medical school. This, however, has no bearing on the proper analysis of the present case.

physician to practice medicine. Finucan used his professional skills and his knowledge of his three female patients' personal and familial situations to play upon their emotional vulnerabilities, even if they facially consented to the sexual relationships. The facts support a finding that he abused his professional status and knowledge by losing objectivity and recommending treatment for them for his own gratification, rather than for what objectively was best for the patients. For these reasons, a physician who enters into such a dual relationship commits unprofessional conduct "in the practice of medicine."

In *McDonnell v. Commission on Medical Discipline*, 301 Md. 426, 483 A.2d 76 (1984), we first considered what "in the practice of medicine" meant in the context of § 14–404(a)(3). We were asked to determine whether a physician who attempted to intimidate witnesses scheduled to testify against him in a medical malpractice action could be disciplined for "[i]mmoral conduct of a physician in his practice as a physician," under Md.Code Ann. (1957, 1980 Repl.Vol.), Art. 43, § 130(h)(8), the predecessor to § 14–404(a)(3). *McDonnell*, 301 Md. at 428, 483 A.2d at 76. We resolved that Dr. McDonnell's conduct, although "improper and not to be condoned," did not occur "in his practice as a physician." 301 Md. at 434, 483 A.2d at 80. We reasoned that the meaning of the phrase "practice as a physician" was limited "to matters pertaining essentially to the diagnosis, care or treatment of patients." 301 Md. at 436, 483 A.2d at 80. We agreed with Dr. McDonnell's concession, however, that the classic illustration of " 'immoral conduct of a physician in his practice as a physician' is the commission of a sex act on a patient, while the patient is under the doctor's care." 301 Md. at 436 n. 5, 483 A.2d at 80 n. 5.

In *Board of Physician Quality Assurance v. Banks*, 354 Md. 59, 72–73, 729 A.2d 376, 383 (1999), we most recently examined the phrase "in the practice of medicine" in § 14–404(a)(3). In *Banks*, we rejected the argument that *McDonnell* should be read as precluding a physician from being sanctioned under the statute for committing acts of sexual harassment against colleagues in the workplace. *Id.* Dr.

Bank's conduct included his unwelcome sexual comments and inappropriate touching, squeezing, and pinching of the anatomy of various female employees who worked at a hospital. 354 Md. at 62–64, 729 A.2d at 378. We rejected Dr. Banks's argument that "a physician may only be sanctioned under § 14–404(a)(3) if he or she is in the immediate process of diagnosing, evaluating, examining or treating a patient and engaged in a non-clerical task." 354 Md. at 73, 729 A.2d at 383. Such an "approach so narrowly construes § 14–404(a)(3) that it would lead to unreasonable results and render the statute inadequate to deal with many situations which may arise." *Id.* Rather, Dr. Bank's conduct was a threat to patients and was, thus, "in the practice of medicine." We stated that

The Board of Physician Quality Assurance is particularly well-qualified to decide, in a hospital setting, whether specified misconduct by a hospital physician is sufficiently intertwined with patient care to constitute misconduct in the practice of medicine. In light of the deference which a reviewing court should give to the Board's interpretation and application of the statute which the Board administers, we believe that the Board's decision in this case was warranted. When a hospital physician, while on duty, in the working areas of the hospital, sexually harasses other hospital employees who are attempting to perform their jobs, the Board can justifiably conclude that the physician is guilty of immoral or unprofessional conduct in the practice of medicine.

354 Md. at 76–77, 729 A.2d at 385.

*McDonnell* and *Banks* are persuasive authorities in the present case. Although not a holding in *McDonnell*, we agreed with the principle that a physician acts in the practice of medicine by committing a sex act on a patient "under the doctor's care." *McDonnell*, 301 Md. at 436 n. 5, 483 A.2d at 80 n. 5. Moreover, *Banks* indicates that if the physician's misconduct relates to the effective delivery of patient care, the misconduct occurs in the practice of medicine. *Banks*, 354 Md. at 74, 729 A.2d at 384.

In the Court of Special Appeals in the present case, Judge Barbera, writing for the panel, made four particularly cogent points refuting Finucan's narrow interpretation of "in the practice of medicine" by which he sought to limit the scope of § 14–404(a)(3) to sexual conduct that occurred while he was "on duty" in medical environs:

First, Dr. Finucan's sexual relationships with these patients grew directly out of, were conducted over the same period of, and were entangled with their respective physician-patient relationships. For example, Dr. Finucan brought Patient A's medications to her home. And, during Patient D's hospitalization, which was while Patient D and her children resided in his home, Dr. Finucan served as her attending physician.

Second, Dr. Finucan exploited, to his own ends, the trust that his patients placed in him as their physician. In the cases of Patients A and D, he took advantage not only of what he learned from them about their personal lives, but of what he knew to be their emotional vulnerability. Dr. Finucan knew, for example, of Patient A's pending separation from her husband and of her emotional instability. And, in pursuing his personal relationship with Patient D, he capitalized on his knowledge that Patient D's husband was in training on the Eastern Shore.

Third, Dr. Finucan risked losing (if he did not lose altogether) the objectivity that any physician must have when caring for patients. He was derelict in maintaining a professional relationship focused exclusively on the health and welfare of his patients. He subordinated his patients' needs to the gratification of his personal desires. Indeed, he went so far as to suggest that each woman undergo a procedure (in the case of Patients A and B, a surgical procedure) to facilitate their bearing his children.

Finally, Dr. Finucan damaged his patients emotionally. Both Patients A and B sought therapy after their relationships with Dr. Finucan concluded. And, although we do not know the reason for Patient D's apparent suicide attempt (because she did not testify), we do know that the attempt

occurred while she and Dr. Finucan were cohabiting. Dr. Finucan's conduct runs afoul of the maxim *"primum non nocere"* or "first, do no harm."

*Finucan,* 151 Md.App. at 416–17, 827 A.2d at 186–87 (footnote omitted).

As we noted in *Banks,* courts elsewhere "have not applied an extremely technical and narrow definition of the practice of medicine." *Banks,* 354 Md. at 74, 729 A.2d at 384. We continue to favor that approach. Finucan's sexual activities with his female patients go to the heart of his duties as their family doctor. Dr. Muncie, the Board's expert witness in this case, explained the reasons for the ethical bar that prohibits physicians from engaging their current patients in contemporaneous sexual relationships.[6] First, the sexual relationships may grow out of and become entangled with the physician-patient relationship. Second, a physician places himself or herself in the position of being able to exploit his or her intimate knowledge of his or her patients and their families in order to advance the physician's sexual interests. Third, a physician is placed in a position where he or she may lose objectivity and place his or her own needs for gratification above the patient's wishes or best interests. Finally, there is a real danger that these relationships may damage the patient in a number of ways.

The facts of this case amply illustrate the reasons underlying the ethical prohibition against physician-patient sex. Finucan exploited his knowledge of these patients and their families for his own personal gratification, using his medical practice as a springboard, then as a cover, for his sexual adventures, to the detriment of his patients. He met Patient A and B only through his medical practice and began the personal relationships during his medical consultations with

---

6. We, like the Board in this case, express no opinion whether a physician violates § 14–404(a)(3) if he or she renders emergency or isolated/minor medical care to his or her spouse or "significant other" (with whom sexual relations presumedly may have occurred in such a relationship). The holding in the present case, as courts often incant, is limited to its particular facts.

them. He convinced Patient B to bring her daughter under his medical care in order to facilitate his personal relationship with Patient B. He took advantage of his knowledge, attained through his treatment of Husband D, when Husband D would be out of town and that Patient D might be susceptible to his advances. While cohabiting with Patient D, Finucan treated her in the aftermath of her suicide attempt. In addition, he took advantage of Patient A confiding in him about her depression over her marital problems and, during their dual relationships, reinforced his position as her caregiver by bringing medicine to her when he arrived for his night-time sexual visits. Most significantly, he recommended surgery for Patients A and B and fertility testing for Patient D in order to gratify his desire that his patients conceive his children. Finucan not only was treating or recommending treatment for marital problems, depression, fertility matters, and a failed suicide regarding one or another of his sexual partners/patients; he also was treating some of their spouses and family members at the same time. In each episode, Finucan had, or reasonably could be perceived to have, a vested personal interest in his choice of treatment for his patients. His recommendations for medical care in some instances appear to have been based solely on his own interests. His creation of these irreconcilable conflicts of interest compromised his professional relationships with these patients and their families. Finucan's creation of these dual relationships thus was connected with his medical practice and was "in the practice of medicine." [7]

---

**7.** Both the Court of Special Appeals's opinion and the Board's Brief before this Court analogize the appropriateness of the sanction meted out to Finucan to the sanction imposed in the attorney discipline case of *Attorney Grievance Commission v. Goldsborough*, 330 Md. 342, 624 A.2d 503 (1993). The *Goldsborough* case involved an attorney who, over a period of time while he was in his office, kissed one former client, spanked another client, and repeatedly spanked his secretary. We do not consider this attorney grievance case about the sexual harassment of individuals in an office setting analogous to Finucan's consensual sexual relationships with current patients.

Finucan argues further that having sex with his current patients is not "connected with" the practice of medicine because it did not reflect adversely on his technical skills as a physician. It appears from our research that this argument universally has been rejected by courts confronted by it. *See Larsen v. Comm'n on Medical Competency*, 585 N.W.2d 801, 805 (N.D.1998) (physician's consensual sexual relationship that occurred at physician's home and other locations with current patient met statutory requirement of being "related to the licensee's practice of medicine"); *Pons v. Ohio State Medical Bd.*, 66 Ohio St.3d 619, 614 N.E.2d 748, 751–52 (1993) (physician's consensual sexual relationship with current patient suffering from depression, anxiety, and marital discord violated the profession's Code of Ethics and fell below the medical standard of care); *Gromis v. Medical Bd. of California*, 8 Cal.App.4th 589, 10 Cal.Rptr.2d 452, 458 (1992) ("We recognize that conduct may be substantially related to a physician's fitness though the conduct does not relate to the skills needed for the practice of medicine.") (citation omitted); *Haley v. Medical Disciplinary Bd.*, 117 Wash.2d 720, 818 P.2d 1062, 1069 (1991) (physician's consensual sex with current patient may indicate unfitness to practice a profession or occupation without being directly related to the specific skills needed for that practice). Whatever Finucan's technical skills were or may be, unethical conduct does not need to raise doubts about the individual's grasp of particular technical skills. Unethical conduct may indicate unfitness to practice medicine if it raises reasonable concerns that an individual abused, or may abuse, the status of being a physician in such a way as to harm patients or diminish the standing of the medical profession in the eyes of a reasonable member of the general public. We are satisfied that the Board's concerns with Finucan's sexual liaisons with his various patients are reasonable concerns about him using his position as a physician to prey on his emotionally vulnerable female patients, and his predatory behavior diminishes the standing of the medical profession as caregivers.

Finally, Finucan cites various medical malpractice tort cases from around the country for the proposition that physicians may be sanctioned only if the sexual act is imposed on a patient as a pretext for treatment. *Darnaby v. Davis*, 57 P.3d 100, 105 (Okla.Civ.App.2002); *Iwanski v. Gomes*, 259 Neb. 632, 611 N.W.2d 607, 614 (2000); *Atienza v. Taub*, 194 Cal.App.3d 388, 393, 239 Cal.Rptr. 454 (Cal.Ct.App. 1987). Although this proposition gained currency in medical malpractice cases in certain jurisdictions, the courts in those jurisdictions stated that the proposition is not applicable to a professional responsibility case concerning the applicable ethical standards for a physician. The California courts specifically declined to apply *Atienza v. Taub* to a physician disciplinary case: "[w]e consider the language from *Atienza* regarding [the physician disciplinary statute] to be mere dictum and we decline to apply it to a disciplinary proceeding." *Gromis*, 10 Cal.Rptr.2d at 458. *See also Green v. Bd. of Dental Exam'rs*, 47 Cal.App.4th 786, 55 Cal.Rptr.2d 140, 150 (1996) (distinguishing *Atienza* as a malpractice case not applicable to disciplinary proceedings). Finucan's reliance on *Iwanski* likewise is misplaced because the Supreme Court of Nebraska cautioned that the "issue before us is not whether he conducted himself in accordance with ethical standards applicable to the medical profession." *Iwanski*, 611 N.W.2d at 614–15. Similarly, *Darnaby v. Davis* begins by noting that the Oklahoma courts "are not addressing the professional ethics of sexual contact between a medical professional and a patient, which is universally condemned." *Darnaby*, 57 P.3d at 102.

Finucan also relies on *Hirst v. St. Paul Fire and Marine Insurance Co.*, 106 Idaho 792, 683 P.2d 440, 444 (Ct.App.1984), for the related proposition that physicians may be sanctioned administratively only if the sexual act is imposed on a patient as a pretext for treatment. The *Hirst* case, however, addressed the issue of whether an intentional sexual assault by a physician constituted "professional services" under the provisions of a malpractice insurance contract. *Id.* That is of no relevance to this case. Similarly, Finucan's reliance on *Smith*

*v. St. Paul Fire and Marine Insurance Co.,* 353 N.W.2d 130, 132 (Minn.1984) ("the issue is whether [the physician's] conduct is covered by the professional liability policy issued by insurer"), is misplaced because the Minnesota court stated that its "limited role on appeal [was] to determine the insurance contract's meaning." Nor does *Yero v. Department of Professional Regulation, Board of Medical Examiners,* 481 So.2d 61, 63 (Fla.Dist.Ct.App.1985), support his arguments. The *Yero* court agreed with the administrative hearing officer's findings that "the evidence failed to establish that Dr. Yero either used the physician-patient relationship to engage in sexual activity or exercised influence within a physician-patient relationship for purposes of engaging a patient in sexual activity." *Yero,* 481 So.2d at 63. Contrary to *Yero,* the evidence in the present case establishes, as found by the Board, that Finucan used the physician-patient relationship for purposes of facilitating the engagement of current patients in sexual activities.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY PETITIONER.**